UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| EX REL. ALFRED J. LONGHI, JR., | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-02-4329 |
| | § | |
| LITHIUM POWER TECHNOLOGIES, INC., | § | |
| AND MOHAMMED ZAFAR A. MUNSHI, | § | |
| | § | |
|     *Defendants*. | § | |

**MEMORANDUM OPINION ON SUMMARY JUDGMENT**

Defendants Lithium Power Technologies, Inc. and Mohammed Zafar A. Munshi (jointly and interchangeably referred to as "LPT" or "Munshi") bring this motion for summary judgment with respect to the *qui tam*[1] claims of the relator Alfred J. Longhi ("Longhi" or "relator") brought against them under 31 U.S.C. §§ 3729-3733, the federal False Claims Act ("FCA"). Dkt. 91. "[T]he FCA imposes civil liability upon 'any person' who, inter alia, 'knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval.[2]'" Defendants allege that "[r]elator lacks standing to assert his claims in this lawsuit," because he purportedly executed a release agreeing not to sue LPT and indemnify defendants if he did. Dkt. 36 ¶ 166. After a review of the applicable standard for summary judgment, the litigants' arguments addressing relator's claims and the applicable law, defendants'

---

[1] "Qui tam is short for the Latin phrase qui tam pro domino rege quam pro se ipso in hac parte sequitur, which means 'who pursues this action on our Lord the King's behalf as well as his own.' The phrase dates from at least the time of Blackstone." *Vt. Agency of Natural Res. v. United States, ex rel. Stevens*, 529 U.S. 765, 768 n.1, 120 S. Ct. 1858, 1860 n.1 (2000) ((Scalia, J.) (*citing* 3 W. BLACKSTONE, COMMENTARIES at 160)).

[2] *Id.*

motion for summary judgment on relator's claims based on the release is DENIED. Dkt. 36.

## I. FACTUAL BACKGROUND

In 1997, Relator invested $130,000 to purchase a 8.4% stake in LTP. Dkt. 27 at 4. This stake equated to 12,083 shares in LPT common stock. Dkt. 27 at 4, Dkt. 37, EX. 2 at 1. The shares were issued to The Kathleen M. Longhi Living Trust (the "Trust"). Dkt. 37, EX. 2, at 1. While Longhi signed the stock sale agreement as trustee of the Trust, it is unclear from the record whether Longhi was a beneficiary of the Trust. Dkt. 92 at 8-9, *but see* Dkt. 37, EX. 2 at 1 (Defendant Munshi stating that " it is my understanding that Mr. Longhi was the trustee and possibly a beneficiary of the Trust.") (emphasis added).

In March 2000, Relator joined LTP as an employee. Dkt. 27 at 4. During his employment relator claims he became aware of defendants' alleged scheme to defraud the government in contracts solicited by LTP under the federal Small Business Innovation Research Program ("SBIR"). Dkt. 27. On November 18, 2002, relator filed his action under seal, as is required by the FCA. Dkt. 27 at 4; Dkt. 36 at 1. Eleven days later, on November 29, 2002, the Trust executed a stock sale and conveyance agreement, selling its 12,083 shares to Munshi's wife for $80,000. Dkt. 91, Ex.2. In conjunction with the stock sale agreement, relator purportedly executed a general release as well as a covenant agreeing not to sue LPT. *Id.* On December 17, 2002, the government obtained a search warrant. Dkt. 96 at 3-4. The United States, after a lengthy investigation, which it suggests did not start in earnest until about December 17, 2002, ultimately chose to intervene in the matter almost 3 years later in 2005. *Id.* at 4.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories,

2

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248; *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), cert. denied, 122 S. Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323. Only when the movant has discharged this initial burden, does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment and no defense to the motion is required. *Id.*

In responding to a properly supported summary judgment motion, the non-movant cannot merely rely on its pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11, 106 S. Ct. 1348 (1986); *Guillory v. PPG Indus., Inc.*, 434 F.3d 303, 309 (5th Cir. 2005). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *See*

*Anderson*, 477 U.S. at 255; *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).

### III. ANALYSIS

The court finds the release unenforceable for the following reasons.  First, the release is invalid because of public policy demands and the pro-plaintiff posture of the FCA.  Second, the release is also invalid under the plain language of the FCA.  Statutory construction suggests that a release entered into during the proscribed 60-day investigatory period unduly interferes with the United States' exclusive and unilateral right during that time to evaluate whether to join the *qui tam* action.  Defendants argue that the release should be analyzed under contract law.  Even in the event that the court performed such a review, the defendants have not met their burden for summary judgment.[3]  However, such an analysis here would be contrary to the federal common law principles expressed in *Town of Newton v. Rumery*, 480 U.S. 386, 107 S. Ct. 1187 (1987).  Therefore, the court declines the invitation.  In addition, defendants' counterclaim for breach of contract and indemnification must collapse under the same analysis as the release, because one cannot exist without the other.  And finally, case law squarely on point suggests that any indemnification of a *qui tam* defendant by the relator fails as a matter of law.

**1. The Enforceability of Longhi's Release**

    **A. The Public Policy Rationale**

"The qui tam provisions of the False Claims Act create incentives for potential whistle

---

[3] Because the record evidences that there is a genuine issue of material fact as to who signed the release agreement, or if Longhi received any consideration as an individual, if he indeed was an individual signatory, this court will not analyze this case under contract or trust law. Even if we were to apply contract law, it is unclear from the record before the court whether Longhi signed the stock sale agreement in his individual capacity or on behalf of the Trust.  Movants have the burden to prove that relator signed in his individual capacity or at a minimum, as a beneficiary of the Trust. Defendants have not done so.  Accordingly, summary judgment cannot be rendered.

blowers to assist the government to discover fraud against the taxpayers." *United States v. United States ex rel. Thornton*, 207 F.3d 769, 771 (5th Cir. 2000) (*citing* Hall). "The FCA allows a private citizen with special knowledge of fraud against the government to commence suit in the name of the government." *Id.* (*citing* 31 U.S.C. § 3730(b)(1) (1999)) (emphasis added). As the United States correctly points out, it is in the public interest to protect the federal treasury and ensure the integrity and honesty of those that receive payments from the government. Dkt. 96 at 12. Enforcement of the release would run counter to this public policy and serve to potentially shield those who allegedly commit fraud against the United States. *Id.*

       (i) Applying *Town of Newton v. Rumery*[4]

Under federal common law " a promise is unenforceable if the interest in its enforcement is outweighed in the circumstance by a public policy harmed by enforcement of the agreement." *Rumery*, 480 U.S. at 392. Courts have applied *Rumery* to a broad spectrum of pre- and post-filing releases of *qui tam* claims entered into without the United States' knowledge or consent. *See, e.g. United States ex rel. Bahrani v. Conagra, Inc.*, 183 F. Supp. 2d 1272 (D. Colo. 2002) (denying defendants' motion to dismiss and finding a pre-filing release invalid because the government only started investigating the matter *a number of weeks after* the filing of the *qui tam* action), *rev'd on other grounds*, 465 F.3d 1189 (10th Cir. 2006)*; Brown v. City of South Burlington*, 393 F.3d 337, 338 (2d Cir. 2004) (analyzing a pre-filing release related to a *qui tam* action under contract law but allowing the case to go to trial to determine whether the release had been obtained under duress); *United States ex rel. Gebert v. Worldwide Technology, Inc.*, 260 F.2d 909 (8th Cir. 2001) (distinguishing its facts from *Green* and finding a pre-filing release of a *qui tam* claim in a

---

[4] 480 U.S. 386 (1987).

bankrupcty estate valid); *United States ex rel., Hall v. Teledyne Wah Chang Albany*, 104 F.3d 230, 233 (9th Cir. 1997) (upholding a pre-filing release because the government had already <u>fully and extensively</u> investigated the allegations for approximately two years prior to the filing of the *qui tam* action and for some time subsequent to the filing, and based on its findings, had declined to intervene); *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 956, 969 (9th Cir. 1995) (finding a pre-filing release invalid).

As defendants correctly state, *Rumery* has two prongs that must be satisfied in order for this common law exception to apply: (1) public policy must actually be harmed by enforcement of the release at issue, and (2) public policy must outweigh the interest in enforcing the release. Dkt. 92 at 19. Defendants further argue that plaintiffs have not met their burden of proof under *Rumery*. *Id*. As the discussion below will show, the plaintiffs—assuming they did indeed have this burden—have met it.[5] The public policy at issue applies not only to Longhi as an individual, but also covers the universe of all future relators. Public policy is meant to view the forest, not the trees. The public

---

[5] Although defendants cite no support for their proposition that *Rumery* places the burden of proof on plaintiffs, the court assumes defendants are relying on Justice O'Connor's concurrence in the *Rumery* plurality opinion. *Rumery*, 480 U.S. at 399. In particular, defendants likely refer to Justice O'Connor's specific disagreement with, and narrowing of, Part III-B of the plurality opinion. *Id.* at 401. Justice O'Connor specifically allocates the burden of proof to the person wishing to make certain releases unenforceable. *Id.* However, if we choose to accept Justice O'Connor's narrow construction of *Rumery*, we must accept it *in toto*. The test she proposes only addresses the narrow universe of release-dismissal agreements under § 1983. *Id.* Her 3-prong test allows "defendants in a § 1983 suit [to] establish that a particular release executed in exchange for the dismissal of criminal charges, was (i) voluntarily made, (ii) not the product of prosecutorial overreaching, and (iii) in the public interest." (numbering added) Justice O'Connor is in fact carving out a right for state actor defendants. Her reasoning does not extend to releases between *qui tam* relators and defendants.

Additionally, the RESTATEMENT (SECOND) OF CONTRACTS clearly allocates the "balancing" of public policy determinations regarding enforceability of contracts or clauses to the court and does not discuss an allocation of the burden of proof to a specific party. RESTATEMENT (SECOND) OF CONTRACTS § 178 cmts. b & c (1981).

interest implicated here is the ability of the government to obtain information from relators it could not otherwise obtain. *See Hall*, 104 F.3d at 233. It was precisely the government's—and by extension the public's— interest in gaining full information from the relator that made the *Green* court hold the release unenforceable. *Green*, 59 F.3d at 968. In *Green*, the relator had already filed—and settled—various state law claims with his former employer and others. *Id.* at 966. Subsequently, and after signing a release as part of that settlement, Green filed a *qui tam* action. *Id.* at 966 & n.11. Had the release been enforced, the government would not have had the opportunity to fully investigate the matter. *Id.* As the *Green* court succinctly noted, "if the release [would] be enforced, [the potential relator would] have no right or reason to file a *qui tam* claim. *Id.* at 965. As a result, the "deterrent objectives" of the FCA would be significantly undermined. *Id.* In *Hall*, on the other hand, a full-blown investigation conducted by the government found no substantiation for the *qui tam* allegations, and the government chose not to intervene; therefore the public policy prong requiring invalidation of the release was not implicated. *Hall*, 104 F.3d at 233. In fact, the *Hall* court made this very clear when it stated that it "deemed the question of the government's lack of knowledge 'critical'" to its decision. *Id.* This case factually resembles *Green*. Longhi had not given the government all the information it needed in order to determine whether to intervene prior to the execution of the release. Dkt. 96 at 3. In fact, the United States had barely begun its investigation when Longhi filed his *qui tam* lawsuit. *Id.* According to the United States, "Longhi's assistance, and that of his counsel, were extremely important when it came time for the United States to make an informed intervention decision." *Id.* Almost three years later, on September 14, 2005, the United States ultimately intervened. *Id.* at 4. The public policy objectives here clearly outweigh the defendants' interest in enforcing the release. If this type of release were enforced,

effective fraud investigations under the FCA would be acutely compromised. *Cf. Hall* 104 F.3d at 233 (emphasizing that the enforcement of a release turns on whether the government has had ample opportunity to investigate the allegations). Without a relator's participation, the government would often be unable to hold accountable those who violate the FCA and defraud this nation's taxpayers and its government. *See id.* Defendants suggest a solution to this problem: Simply enforce the release, but allow the government to hire the relator as a "consultant." Dkt. 92 at 28. This suggestion is ill-informed and demonstrates a fundamental misunderstanding of basic *qui tam* policy. To do as defendants suggest would undermine Congress's fundamental intent behind the Act, i.e. giving the relator a <u>personal</u> stake in the claim, which varies according to his or her level of participation. *Green*, 59 F.3d at 958 (citing *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 74849 (9th Cir. 1993)).

Moreover, defendants are disingenuous when they declare that *Green* draws a bright line between pre-filing and post-filing releases. Dkt. 92 at 24-26. According to defendants, pre-filing releases may be held unenforceable, while post-filing releases must be enforced as a matter of law. *Id.* The court is not persuaded by this argument. If there is a dividing line to be found between *Hall* and *Green*, it is the fullness of the government's investigation, not the timing of the release. These two cases must be regarded merely as data points on the broad spectrum of the *Rumery* federal common law test. In fact, a careful reading of *Hall* and *Green* reveals that since they both technically implicate pre-filing releases, they would not support defendants' position anyway. *See generally Hall*, 104 F.3d 230 (*Hall* was technically a post-government notification but pre-*qui tam* action filing case). Moreover, the Supreme Court in *Rumery* rejected any type of *per se* rule pertaining to releases outright. *Rumery,* 480 U.S. at 392. As stated above, Longhi is precisely the

kind of person the FCA seeks to empower and shelter. Longhi is a private citizen with special knowledge of alleged fraud. To enforce the release against him would not only ignore the public policy objectives Congress has expressly spelled out in the FCA, it would disincentivize future relators. Conversely it would also encourage those guilty of fraud on the United States to insulate themselves from the reach of the FCA by simply forcing potential relators to sign general releases. The court will not let that happen. This case illustrates why the Supreme Court in *Rumery* refused to provide a bright line rule. The government absolutely could not have gone forward without the co-operation of the relator. To enforce this release would not only have a chilling effect on the government's ability to investigate FCA fraud, but also on its ability to rely for support on those who have special knowledge of the fraud perpetrated on the United States—the relators.

      (ii) Applying *Hall*

Defendants advocate that *Hall* is squarely on point. Nonetheless, the actual application of the *Hall* test to the case at bar —contrary to what defendants suggest—supports this court's conclusion that Longhi's post-filing release is unenforceable. *Hall* mandates that a release be upheld if the defendant proves that (1) the federal government had <u>full knowledge</u> of the plaintiff's charges before the release was executed, and (2) the federal government had <u>already investigated</u> the allegations prior to their release. *Hall* 104 F.3d at 232-32. In this case, the government has unambiguously stated that without relator's extensive support subsequent to November 29, 2002, (the date of the release), it could not have issued a search warrant or made sense of the documents procured thereby. Dkt. 96 at 3-4. Defendants fail the first prong of *Hall* because there exists at least a material issue of fact as to the government's having "full knowledge" of the charges. Defendants also fail to establish the second prong. Because the government did not obtain the requisite

9

documents to allow it to investigate the alleged false claims until approximately five weeks <u>after</u> the action was filed, the government had clearly not had the opportunity to "investigate" the allegations prior to their supposed release. Without relator's extensive involvement in the official investigation into defendants' actions, which lasted from 2002 to 2005, when the government ultimately decided to intervene, the government could not have developed "full knowledge" of the alleged violations of the FCA. Defendants therefore have failed to demonstrate that the government had fully investigated the matter or even had full knowledge of the alleged fraud prior to the execution of the release, as is required under *Green/Hall*. *See generally Bahrani*, 183 F. Supp. 2d 1272 (applying the *Hall* test accordingly).

### B. Statutory Construction

In addition to the policy reasons to find the release unenforceable, the statute itself and its related legislative history also militate against enforcing such a release. Subsection (b)(1) of 31 U.S.C. § 3730 authorizes a private person to bring a civil action for a violation of Section 3729 on behalf of the Government. "The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b)(1). In addition, subsection (b)(2) requires the complaint to be filed under seal and that "substantially all material evidence and information the person possesses shall be served on the Government." 31 U.S.C. § 3730(b)(2). The complaint must "remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information." *Id*. The 60-day period does not begin until both the complaint and the material evidence are received. *See* S. REP. No. 99-345, at 23 (1986), *as reprinted in* 1986 U.S.C.C.A.N.

5266, 5288. The Government may extend this 60-day evaluation period by a showing of good cause to a court. 31 U.S.C. § 3730(b)(3). "The initial 60-day sealing . . . has the same effect as if the *qui tam* relator had brought his information to the Government and had notified the Government of his intent to sue. The government would need an opportunity to study and evaluate the information in either situation." S. REP. No. 99-345, at 24, *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5289.

     Relator signed the release of his claims 11 days after he had filed his *qui tam* complaint under seal. This 11-day period falls squarely within the government's 60-day statutory evaluation period. *Accord Green*, 59 F.3d at 959 (acknowledging that *settlements* during the initial sixty-day period can only be dismissed "if the court and Attorney General give written consent for the dismissal and their reasons for consenting") (original emphasis omitted; court's own emphasis added)). The government states that its investigations into Longhi's allegations did not begin in earnest until December 17, 2002, exactly 29 days after the complaint was filed. Dkt. 96 at 3. Even if the release were valid, the relator could not have entered into it at the time he did, without the <u>express knowledge and consent</u> of the United States, because the government's actions were still governed by its statutory 60-day review window. Relator never received such express written consent, and defendants have failed to meet their burden of proof in providing even a shred of evidence that the government would have granted such a request. In fact, based on the government's response to the defendants' motion for summary judgment, it is clear that the government would not have granted such a request. Dkt. 96. It is the government's prerogative to establish when it has received all material information pertinent to the matter. The government's filings indicate that the 60-day period may not even have been triggered until on or about December 17, 2002. Dkt. 96 at 4. A

11

release signed during that 60-day window would eviscerate congressional intent affording the United States the opportunity to investigate—for sixty days at a minimum—in peace. Therefore, to give effect to the 60-day seal and investigation period in the statute, absent other circumstances not present here, a release signed during § 3730(b)'s 60-day period is presumptively invalid.

In addition, the Fifth Circuit, as well as the Sixth Circuit, have held that a "relator may not seek voluntary dismissal of any qui tam action even extending beyond the 60-day intervention window."[6] *Searcy v. Philips Electronics of N. Am. Corp.*, 117 F.3d 154, 159 (5th Cir. 1997) (holding that Section 3730(b)(1) "plainly allows the government to veto proposed settlements"); *United States v. Doyle*, 207 F.3d 335 (6th Cir 2000) (same). *Searcy* refers to settlements rather than releases. *Searcy*, 117 F.3d at 159. But, the basic effect of a settlement and a release are the same insofar as they relate to the position of the parties to the action. Therefore, the holding in *Searcy* can be applied to releases as well. Precisely because the relator is so critical to the government's ability to investigate an action brought under the FCA, and its decision whether or not to join, a relator should not be able to withdraw from participation in the action for at least this preliminary 60-day period, unless requested to do so by the United States.[7] To allow the nullification of the relator—either

---

[6] Contrary to relator's claim that the action does not belong to relator, the Fifth Circuit has expressly held that relator is a party to the suit. "Where an FCA suit is initiated by a private person ... the text of the statute explicitly states that although the suit is "brought in the name of the Government," the action is brought "for the person and for the Government." *United States ex rel. Patricia Laird v. Lockheed Martin Engineering and Science Services Co.*, 336 F.3d 346 (5th Cir. 2003) (citing 31 U.S.C. § 3730(b)(1)); *accord United States ex rel. Foulds v. Tex. Tech Univ.*, 171 F.3d 279, 289 n.16 (5th Cir. 1999) ("Our own circuit precedent describes the United States as 'a' real party in interest rather than 'the' real party in interest."); *see also Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772-73, 120 S. Ct. 1858, 1862 (2000) (finding that "the statute gives the relator himself an interest in the lawsuit, and not merely the right to retain a fee out of the recovery").

[7] *Searcy* clearly grants a much broader right to the United States, which extends far beyond the initial 60-day period, namely through the entire term of a *qui tam* action. The court need not

voluntary or involuntary—clearly violates the public policy objectives outlined above, as well as the broad power to reject a settlement granted to the United States in *qui tam* actions.

**2.      Defendants' counterclaims**

In the instant case, defendants bring a counterclaim for breach of contract and indemnification.[8] A citizen's obedience to the law—state and federal—is a clearly mandated public policy of every state. *Cf., e.g., Brandon v. Anesthesia & Pain Mgmt. Associates, Ltd.*, 277 F.3d 936 (7th Cir. 2002). "The FCA is in no way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff." *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nevada (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991). This principle has been firmly embedded in this nation's *qui tam* jurisprudence for sixty years. In a seminal 1947 case, the district court for the Southern District of New York dismissed a *qui tam* defendant's counterclaim seeking indemnification for potential FCA liability, because to "permit a counterclaim . . . would set a precedent that would be a strong deterrent to the institution of genuine informer's actions . . . [A] sensible application of the qui tam statute should bar the plea of a counterclaim against the informer." *Rodriquez v. Weekly Publications, Inc.*, 74 F. Supp. 763, 764 (S.D.N.Y. 1947). A multitude of courts addressing this very issue, have echoed this holding. *See, e.g.*, *Israel Discount Bank Ltd. v. Entin*, 951 F.2d 311, 315 (11th Cir. 1992) ("[T]here is no right to indemnity ... under the FCA."); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, No. 99-3298, 2004 WL2009413, *7 (D.D.C. May 17, 2004) (defendants " do not have any rights to indemnity . . . under

---

stretch its application of *Searcy* so far since the release in the instant case was executed well within the 60-day period.

[8] Defendants also bring a counterclaim for breach of fiduciary duty. Since, unlike defendants' other counterclaim, the fiduciary duty claim is not implicated by the policy objectives regarding the enforcement of the release, the court will not address it.

13

the FCA"); *United States ex rel. Public Integrity v. Therapeutic Technology, Inc.*, 895 F. Supp. 294, 297 (S.D. Ala. 1995) ("[Q]ui tam defendants lack a right to bring claims that will have the effect of offsetting FCA liability."); *United States v. Nardone*, 782 F. Supp. 996 (M.D. Pa. 1990). Congress purposefully intended the litigation structure under the FCA to be uniquely pro-plaintiff. *See United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, No. 2:96-1676-12, 2002 U.S. Dist. LEXIS 26986, at *19-20 (D.S.C. 2002).

Defendants assert that relator has breached an agreement with LTP and is contractually obligated to indemnify LTP for (a) all costs and expenses incurred in the defense of this lawsuit, (b) all sums recovered by the United States from Lithium Power in this lawsuit, and (c) consequential damages to LTP's business arising from this lawsuit. Dkt. 36 at ¶¶ 172, 173. Defendants' counterclaim for breach of contract and indemnification is precisely the type of indemnification *qui tam* defendants should be denied as a matter of public policy. Therefore, as a matter of law, defendants' counterclaim for contribution and indemnification will be dismissed.

## IV. CONCLUSION

After reviewing the arguments of the parties, the summary judgment record, and the applicable law, the defendants' motion for summary judgment on relator's claims based on the release is DENIED. The defendants' counterclaim for breach of contract and indemnification is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on March 23, 2007.

_____
Gray H. Miller
United States District Judge