# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *EX REL.* ALFRED J. LONGHI, JR., | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-02-4329 |
| | § | |
| LITHIUM POWER TECHNOLOGIES, INC., | § | |
| AND MOHAMMED ZAFAR A. MUNSHI, | § | |
|     *Defendants*. | § | |

## ORDER

Currently pending before the court are three motions for partial summary judgment. The plaintiffs, the United States and Longhi (collectively the "U.S.") move for partial summary judgment as to liability under the False Claims Act on four of the five contracts that are the subject of the claims in which the United States has joined.[1] Dkt. 68. Additionally, the defendants, Lithium Power Technologies, Inc. and Mohammed Zafar A. Munshi (collectively "LPT") have filed cross-motions for partial summary judgment as to liability on the same claims. Dkts. 83 & 89. Upon consideration of the motions, the responses, the replies, the considerable summary judgment record, and the applicable law, the plaintiffs' motion for partial summary judgment is GRANTED, and the defendants' cross-motions are DENIED.

## I.   BACKGROUND

### A.   The Small Business Innovation Research Program

The funds at issue in this case are all derived from awards under the federal Small Business Innovation Research ("SBIR") Program. Although the Small Business Administration ("SBA")

---

[1] The relator Longhi has many other claims in which the United States has elected not to join.

governs, monitors, and analyzes the program, individual federal agencies administer funding under the SBIR.  Any federal agency with a research and development budget in excess of $100 million must administer an SBIR program.  Applicants for funding under the program submit proposals to the individual agencies.  The program is extremely competitive, and each agency makes its funding decisions without input from other agencies or the SBA.

Phase I proposals, or startup proposals, are granted to allow a business to explore the feasibility of its ideas.  Phase I proposals may be funded for a time period of approximately six months for up to $100,000.  Upon the successful completion of a Phase I program, award winners generate a final report for the supervising agency.  Only Phase I award winners may submit a next-step or Phase II proposal.  Phase II funding for research and development lasts up to two years and is subject to a cap of $750,000.  Additionally, during this time the business should assess the commercial potential of the idea or technology.  Again, upon completion of the Phase II program, award winners generate a final report for the supervising agency.  Finally in Phase III, the business takes the idea developed through Phases I and II and introduces it to the market.  The SBIR program does not extend to Phase III.

### B.    Lithium Power's SBIR funded proposals

LPT came into being in 1998 as the successor to a series of companies run by defendant Mohammed Zafar A. Munshi.  According to Munshi, LPT was founded "to conduct research and development on advanced lithium primary and secondary batteries and various capacitor technologies, including aluminum electrolytic, plastic film, electrochemical and high energy density ceramic capacitors."  Dkt. 67, Ex. 1.  The contracts that are at issue in this motion are the result of funded proposals under Department of Defense SBIR programs administered by the Army Space and

Missile Defense Command ("ASMDC"), the Ballistic Missile Defense Organization ("BMDO"), and

the Air Force.  In total, the contracts spanned a 6 year period from 1998 through 2004 with some

substantial overlap.

| Date | Army Phase I | Army Phase II | Air Force Phase I | Air Force Phase II |
|------|-------------|---------------|-------------------|--------------------|
| 1/10/1998 | Proposal Submitted | | | |
| 8/1/1998 | Work Begins | | | |
| 3/15/1999 | Work Completed | | | |
| 5/3/1999 | Final Report | | | |
| 7/12/1999 | | Proposal Submitted | | |
| 1/11/2000 | | | Proposal Submitted | |
| 2/25/2000 | | Work Begins | | |
| 3/29/2000 | | | Work Begins | |
| 10/27/2000 | | | | Proposal Submitted |
| 12/28/2000 | | | Work Completed | |
| 1/20/2001 | | | Final Report | |
| 3/28/2001 | | | | Work Begins |
| 2/24/2002 | | Work Completed | | |
| 4/19/2002 | | Final Report | | |
| 7/27/2003 | | | | Work Completed |
| 4/1/2004 | | | | Final Report |

The ASMDC contract was the Phase I proposal for the development of very thin rechargeable

batteries.  For ease of identification, the ASMDC Phase I contract will be designated Army Phase

I.[2]  The BMDO contract was the follow-up contract, or Phase II, of the development of very thin

rechargeable batteries.  The BMDO contract will be designated Army Phase II.  The Air Force

---

[2]  Both parties have conceived their own systems of nomenclature for identifying the contracts.  The nomenclature has changed from pleading to pleading.  In their motion, the plaintiffs suggest that the contracts be labeled chronologically 1 through 4.  While this has a certain logic, it does not maintain the Phase I and Phase II relationship among the four contracts.  The defendants would prefer that the contracts be designated BMDO Phase I and II, and Air Force Phase I and II.  Again, there is a certain logic to their system.  However, given the option between BMDO, ASMDC, and Army, the best choice for ease of use seems to be a word rather than an acronym.  The choice of designation in no way reflects any finding of fact regarding the supervising agency of the contracts.

contracts—Air Force Phase I and Air Force Phase II—were funded to study the feasibility of microelectricalmechanical systems ("MEMS") batteries using solid electrolytes for micro-satellites. LPT has derived the lion's share of its income from government-funded research programs. In fact, during the period in question, LPT garnered over $5.8 million in government funds for research.

### C.    Alfred J. Longhi, Jr.—The Relator

In 1997, the relator, Alfred J. Longhi, Jr., who was not an LPT employee, began recruiting investors for LPT and later invested his own money in the venture. Dkt. 27. In March of 2000, he joined LPT and became vice-president for sales and marketing. *Id.* During his time as an employee at LPT, Longhi became aware of the defendants' alleged schemes to defraud the government. *Id.* In November of 2002, Longhi sold his LPT stock back to the company, resigned his position, and filed this *qui tam* action. *See* Dkt. 101.

### D.    Procedural History

Longhi originally filed his complaint under seal on November 18, 2002. Dkt. 1. After several years of investigation, the civil division of the U.S. attorney's office elected to intervene in only those claims related to "the allegations pertaining to duplicative research and work, and the fraudulent billing related to that duplicative research and work" on the four contracts at issue in this motion[3] and claims related to one additional non-SBIR contract with NASA,[4] not part of this

---

[3]    Those contracts are: (1) ARMY-8630: F08630-98-C-0066-P00001, Very Thin Rechargeable Battery; (2) ARMY-0018: DAS60-00-C-0018, Very Thin Rechargeable Battery; (3) USAF-2122: F33615-C-2048, Micro Electrical Mechanical - MEMs; and (4) USAF-2048: F33615-01-C-2122, Micro Electrical Mechanical - MEMs.

[4]    That contract is NAS3-01189, NRA Polymer Electrolytes.

motion.[5]  Dkt. 20.  Shortly thereafter, on October 10, 2005, the court unsealed the complaint and election notice.  Dkt. 23.  Munshi was served a week later, on October 17, 2005.  Dkt. 26.

The U.S. complaint alleged violations of 31 U.S.C. §§ 3729(a)(1) & (2)—the False Claims Act, payment by mistake of fact, unjust enrichment, and common law fraud.  Dkt. 24.  The Longhi complaint alleged only violations of the False Claims Act, but encompassed many more alleged instances of fraud.  Dkt. 27.  LPT answered the U.S. complaint on November 7, 2005.  Dkt. 28.  In a separate document, LPT also answered Longhi's complaint and asserted counterclaims against Longhi for breach of contract and indemnification, and breach of fiduciary duty.  Dkt. 36.

Both plaintiffs moved for partial summary judgment on liability under the False Claims Act on four out of the five contracts named in the U.S. complaint.  Dkt. 67.  LPT cross moved for partial summary judgment on those same claims.  Dkts. 83 & 89.  Additionally, LPT moved for summary judgment with respect to the *qui tam* claims of the relator based on a release signed by the relator at the time of his separation from LPT.  Dkt. 91.  On March 23, 2007, the court denied LPT's motion for summary judgment on the relator's claims and dismissed LPT's counterclaim against the relator for breach of contract and indemnification.  Dkt. 101.  All discovery has been stayed pending a ruling by the court on the plaintiffs' motion for partial summary judgment and the defendants' cross motions for partial summary judgment.  Dkt. 100.

---

[5]  In a separate criminal action, the government executed a criminal subpoena and seized approximately 40 boxes of documents from LPT in December 2002.  *See* Dkt. 53.  Ultimately, the criminal division of the U.S. attorney's office decided not to bring criminal charges against Munshi and LPT.

## II.   STANDARD

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   FED. R. CIV. P. 56(c); *see also Christopher Village, L.P. v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999).   The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).   An issue is "material" if its resolution could affect the outcome of the action.   *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S.Ct. 347 (2001).   "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.   *Id.* at 322.   If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required.   *Id.*

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."   *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).   To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting FED. R. CIV. P. 56(e)).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.   *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 163-64 (5th Cir. 2006).   The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.   *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).   However, the nonmovant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."   *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).   By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."   *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Amer. Corp.*,   754 F.2d 1212, 1221 (5th Cir. 1985).

## III.    THE FALSE CLAIMS ACT

"The civil False Claims Act imposes liability on any person who knowingly submits, or causes the submission of, a false or fraudulent claim for money to the government."   *United States*

*v. Southland Mgmt. Corp. (Southland I)*, 288 F.3d 665, 674 (5th Cir. 2002) *vacated on reh'g en banc on other grounds,* 326 F.3d 669 (5th Cir. 2003).  The act reads, in relevant part:

> Any person who
>
> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> • • •
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000,[6] plus 3 times the amount of damages which the Government sustains because of the act of that person
>
> • • •
>
> the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of the person.  A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

31 U.S.C. § 3729(a).

In order for the plaintiffs to prove liability under § 3729(a)(1), they must demonstrate that (1) LPT made a claim for payment or approval to an agency of the government; (2) the claim was false or fraudulent; and (3) LPT made the claim with the requisite scienter.  *Southland I*, 288 F.3d at 675; *United States v. N. Am. Constr. Corp., et al.,* 173 F. Supp. 2d 601, 618 (S.D. Tex. Nov. 21, 2001) (Rosenthal, J.).  Likewise, liability under § 3729(a)(2) may be proved upon a showing that (1) LPT made a record or statement in order to get a government agency to pay money; (2) the record or statement was false or fraudulent; and (3) LPT made the statement or record with the proper scienter.  *Southland I*, 288 F.3d at 675.  Additionally, most courts agree that to prove liability in a civil False Claims Act claim, the misrepresentations must have been material.  *United States v.*

---

[6] Effective August 30, 1999, the minimum and maximum penalties were changed to $5,500 and $11,000 respectively.  *See* 28 C.F.R. § 85.3(a)(9) (2007).

*Southland Mgmt. Corp. (Southland II),* 326 F.3d 669, 679 n. 3 (5th Cir. 2003) (Jones, J., concurring) (citing *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883 (8th Cir. 2003); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785, 788 (4th Cir. 1999); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732 (7th Cir. 1999); *United State v. TDC Mgmt. Corp.*, 24 F.3d 292, 298 (D.C. Cir. 1984)).  Since in the instant case, the claims at issue are also statements or records, the inquiries for §§ 3729(a)(1) and(a)(2) are coterminous.

### A.      Claim For Payment

The Supreme Court has defined a claim as all "fraudulent attempts to cause the Government to pay out sums of money."  *United States v. Neifert-White Co.*, 390 U.S. 228, 233, 88 S. Ct. 959 (1968).  There seems to be little dispute here as to whether LPT presented invoices based on the contracts at issue, and those invoices were paid.  Accordingly, since a call has been made on the federal fisc, the first prong has been satisfied.[7]  *See United States v. Inc. Village of Island Park*, 888 F.Supp. 419, 440 (E.D.N.Y. 1995) ("Fraudulent conduct and false statements remain inchoate until a claim for payment causing the government to disburse funds is made.") (citing *United States v. McNinch*, 356 U.S. 595, 599, 78 S. Ct. 950 (1958)).

### B.      That Was False or Fraudulent and Made With The Requisite Scienter

#### 1.     False

Much debate surrounds the meaning of the phrase "false or fraudulent claim."  *See e.g., Harrison*, 176 F.3d at 785.  However, in the civil version of the False Claims Act, the phrase is construed broadly.  *Id.*  "[T]he Court has consistently refused to accept a rigid, restrictive reading...."

---

[7]  A claim that causes the government to disburse funds should not be confused with damages.  Damages will be addressed later.

*Neifert-White Co.*, 390 U.S. at 232 (internal citation and footnotes omitted). "Thus, any time a false statement is made in a transaction involving a call on the U.S. fisc, False Claims Act liability may attach." *Harrison*, 176 F.3d at 785. In the simplest terms a false claim is "[a]n assertion or statement that is untrue." BLACK'S LAW DICTIONARY 636 (8th ed. 2004). So, under this prong of the test, the question becomes whether the claims or statements are literally true. The parties do not dispute here whether the invoices themselves were factually correct. Instead the government argues that the invoices are tainted because they arise from a contract procured by false or fraudulent claims. Courts have recognized liability under the False Claims Act based on a fraudulent inducement theory.[8] *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902

---

[8] In 1999, the Fourth Circuit wrote an opinion regarding two ways that defendants could be held liable under the FCA despite having submitted accurate invoices: false certification and fraudulent inducement. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999). False certification claims involve schemes where the receipt of federal funds is predicated on compliance with certain statutes. *Id.* For example in *United States v. Incorporated Village of Island Park*, the defendants were required to certify—among other things—that they had selected housing participants on a first-come, first-served basis. 888 F. Supp. 419, 440 (E.D.N.Y. 1995); *see also Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (finding FCA liability for false certification when Medicare forms required the signature of the attending physician that he had personally attended or supervised their care, but were instead signed by another doctor). The Fifth Circuit recognizes false certification FCA liability provided "the government has conditioned payment of a claim upon a claimant's certification of compliance." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).

In a fraudulent inducement claim, "courts, including the Supreme Court, [have] found False Claims Act liability for each claim submitted to the government under a contract, when the contract or extension of government benefit was obtained originally through false statements or fraudulent conduct." *Harrison*, 176 F.3d at 787 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S. Ct. 379 (1943)). These cases are frequently seen in a bid-rigging situation. *Id.*; *Hess*, 317 U.S. at 542-43. In *Hess*, the Supreme Court upheld FCA liability for a group of electrical contractors who conspired on their bids for work on Public Works Administration projects. *Hess*, 317 U.S. at 539.

This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the P.W.A. into the joint fund for the benefit of respondents. The initial fraudulent

(5th Cir. 1997). "[T]he falsity of a claim is determined *at the time of submission*." *Southland I*, 288 F.3d at 681 (emphasis in original). Accordingly, the inquiry narrows even further to examine whether the statements made in the proposals were literally true at the time the proposals were submitted.

----

action and every step thereafter taken, pressed ever to the ultimate goal-payment of government money to persons who had caused it to be defrauded.

*Id.* at 543-44.

The Fifth Circuit has recognized the fraud in the inducement theory under the FCA when dealing with bid-rigging. *See, e.g., United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.*, 491 F.3d 254, 259 (5th Cir. 2007); *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 384 (5th Cir. 2003). In *Laird*, the most recent fraudulent inducement FCA Fifth Circuit case, the defendant Lockheed allegedly underbid a contract with NASA. *Laird*, 491 F.3d at 256-59. Lockheed submitted a bid based on specific man-hour parameters dictated by NASA. *Id.* at 257. The contract at issue was a cost-plus-award-fee ("CPAF") contract paying a base fee at the beginning of the contract and award fees based on contractor performance at regular intervals. *Id.* Under this particular CPAF contract, Lockheed's base fee was zero. *Id.* All awards were discretionary and determined by NASA. *Id.* "[I]f Lockheed failed each award period, it earned nothing." *Id.* The Fifth Circuit discussed at length the uncertain nature of the bid process for this NASA contract, the in-built error in calculating man-hours due to NASA's unrealistic strictures, and the numerous other variables not under Lockheed's control. *Id.* The court then cited *Hess* for the proposition that

to succeed on a fraud-in-the-inducement theory under the FCA, [plaintiff] must prove (1) that Lockheed had no intention to perform the research contract according to the terms of the [proposal]; and (2) that Lockheed obtained payments under the research contract to which it was not legitimately entitled. . . .

Without more, a contract underbid is not a false claim. For FCA liability, there must be a nexus between the underbid and a request for payment that the contractor would not have been entitled to absent the contract.

*Id.* at *3 (internal citations omitted). The court concluded "[t]hat nexus is absent here." *Id.*

2.      Knowledge Under The FCA

"[I]t is impossible to meaningfully discuss falsity without implicating the knowledge requirement."  *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999).  Section 3729 expressly defines the scienter requirement under the False Claims Act to be a person who (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).  Moreover, the section requires "no proof of specific intent to defraud."[9]  *Id.*

The statute expressly reaches three types of knowledge.  *See United States v. Krizek*, 111 F.3d

---

[9]  In the previous footnote, the court examined the Fifth Circuit's decision in *Laird*.  In emphasizing the complete disconnect between Lockheed's bid and the actual work performed, the *Laird* court somewhat overstated the *mens rea* requirement under the FCA.  However, the court clearly did not intend to change the scienter requirement under the FCA.  The statute itself expressly states that "no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b).  And, the weight of the case law states that the scienter requirement under the False Claims Act is (1) actual knowledge, (2) deliberate ignorance of the truth or falsity of the statement, or (3) reckless disregard of the truth or falsity of the information.  *See e.g., Southland II*, 326 F. 3d at 681 n. 7 ("A defendant may be liable for a civil false claim by 'knowingly' presenting such a claim, but specific intent to defraud is not required.") (internal citation omitted); *United States ex rel. Mathews v. Healthsouth Corp.*, No. 01-30862, 2002 WL 31687686 at *1 (5th Cir. 2002) ("To satisfy the intent element, it is sufficient to show that the defendant acted 'in deliberate ignorance of the truth or falsity of the information ... [or] in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'"); *see also Nat'l Athletic Trainers' Assoc., Inc. v. United States Dept. of Health & Human Servs.*, 455 F. 3d 500, 507 (5th Cir. 2006); *Burditt v. United States Dept. of Health & Human Servs.*, 934 F.2d 1362, 1374 (5th Cir. 1991).  *Accord United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 544 (7th Cir. 1999) ("The mens rea element, 'knowingly,' requires that the defendant have actual knowledge of (or deliberately ignore or act in reckless disregard of) the truth or falsity of the information presented; no specific intent to defraud is required."); *United States v. Krizek*, 111 F.3d 934, 941 (D.C.Cir. 1997) ("[R]eckless disregard lies on a continuum between gross negligence and intentional harm.").  Moreover, *Laird* limits its statement to underbid situations.  *Laird*, 491 F.3d at 260.  Neither party has argued that LPT underbid costs in its proposals.  But, *Laird* is applicable to the instant case in the sense that it reaffirms that a fraudulent inducement theory can impute "falseness" to otherwise accurate invoices in the Fifth Circuit.

934, 942-43 (D.C.Cir. 1997).  The first type encompasses actual knowledge.  *Id.*  The second type—according to the relevant Senate Committee Report—contemplates "constructive knowledge" or "what has become known as the ostrich type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."  S. Rep. 99-345, at 20, U.S.C.C.A.N. 5266, 5285 (internal quotation marks omitted).  However, the Committee Report further explained that although "at least some inquiry [must] be made, the inquiry need only be 'reasonable and prudent under the circumstances.'" *Id.* The duty is "a limited duty to inquire as opposed to a burdensome obligation."  *Id.*  The last type of knowledge has been described as "gross negligence plus".  *Krizek*, 111 F.3d at 942 ("While the Act was not intended to apply to mere negligence, it is intended to apply in situations that could be considered gross negligence where the submitted claims to the Government are prepared in such a sloppy or unsupervised fashion that resulted in overcharges to the Government.").  However "innocent mistakes, mere negligence, or even gross negligence (without more) are not actionable under the False Claims Act." *Lamers*, 168 F.3d at 1018.  Courts have consistently found that innocently-made faulty calculations, flawed reasoning, and disputed legal issues arising from vague provisions or regulations cannot support liability under the FCA.  *Southland II*, 326 F.3d at 682.  (citing *United States ex rel. Siewick v. Jameson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C.Cir. 2000); *Lamers*, 168 F.3d at 1019; *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478-79 (9th Cir. 1996); *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992)).  "[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *Id.* (quoting *Lamers*, 168 F.3d at 1019).  Reasoning that since § 3729(b)(2) already addresses willful blindness, and "no statutory provision should be construed as entirely redundant," the D.C. Circuit

has explained that "it is logical to conclude that reckless disregard in this context is not a 'lesser form of intent,' but an extreme version of ordinary negligence." *Krizek*, 111 F.3d at 942 (quoting *Kungys v. United States*, 485 U.S. 759, 778, 108 S. Ct. 1537 (1988); *S.E.C. v. Steadman*, 967 F.2d 636, 641-42 (D.C.Cir. 1992)).   Therefore, in order for the U.S. to prevail on its claims, it must demonstrate both that: (1) the statements or omissions were literally false at the time they were made; and (2) LPT actually knew of, was willfully blind to, or acted with "gross negligence plus" regarding the falsity of those statements or omissions.

   3.   Specific Acts Alleged

In their motion for partial summary judgment, the plaintiffs allege five specific areas of falsity in LPT's SBIR proposals.   Not every false statement applies to every contract.   However, the plaintiffs argue that because a Phase II contract is not possible in the absence of a Phase I contract, a finding of falsity in either of the Phase I contracts taints the related Phase II contracts as well.

   a.   *Corporate Status and History - Army Phase I*

First, the U.S. claims that LPT "grossly misrepresented" its corporate status and history.   Dkt. 67.   Specifically, the U.S. alleges that LPT identified itself as a corporation although it was not incorporated until five months after the proposal had been submitted.   *Id.*   Additionally, the proposal made numerous references to the length of time LPT had been in business doing research.   *Id.*   In Section 2.0 of the Army Phase I proposal entitled Related Work, LPT stated

> Lithium Power Technologies, Inc. was founded in 1992 to conduct research and development on advanced lithium primary and secondary batteries . . . Over the years the company has relied on private funds and [has] developed extensive knowledge on numerous forms of advanced power sources . . .

14

Dkt. 67, Ex. 1 at 16.  The U.S. argues that since LPT did not exist in 1992, it could not have been founded at that time, nor could it have developed extensive knowledge over the years as described in the proposal.  LPT counters that LPT was the successor to a series of companies founded by Dr Munshi and so was metaphysically—if not technically—founded in 1992.  Moreover, LPT argues that both Munshi and Truong were listed in the proposal as still employed at Sulzer.  Dkt. 84 at 11.  And, the evaluation memorandum signed by Walter Maine pointed out that fact.  Dkt. 67, Ex. 14(a).  LPT argues that since the proposal clearly listed Sulzer as the employer of Munshi and Truong, the U.S. could not have believed that LPT had been in existence starting in 1992.  Regardless, LPT cannot and does not argue that its corporate existence started before the proposal was presented to the government.  Accordingly, these statements were not accurate statements of fact at the time made.  Additionally, it is clear from LPT's response that Munshi had actual knowledge LPT was not incorporated until 1998. *Id.* at 10.  At the very least, LPT admits that it acted in reckless disregard of the truth of the statement when it argues that "Dr. Munshi simply gave no thought to the date when he submitted the report." *Id*.  Accordingly, the statements regarding LPT's corporate status and history were literally false and made with the requisite scienter.

> b.    *Key Personnel - Army Phases I & II, Air Force Phase II*

Next, the U.S. argues that LPT misrepresented the key personnel it would use for three out of four of the contracts.  Dkt. 67 at 20.

> I.    <u>Dat Truong</u>

For Army Phase I, LPT stated that "Dat Truong, a Biomedical Engineer at Sulzer Intermedics, Angleton, Texas, will assist in the experimental work." Dkt. 67, Ex. 1 at 18.  However, LPT admits that Dat Truong was never employed by LPT and never did any research work for LPT.

15

Dkt. 67, Ex. 5.  But, LPT argues that Truong voiced his intention of investing in LPT and was involved in the initial set-up of the company.  Dkt. 84, Ex. A.  Therefore, LPT argues that its statement in the proposal was more of a forecast than a statement of present fact.  Because the statement talks about a future event, it cannot be readily classified as true or false on its face.  Its veracity depends on the state of mind of the person making the statement.

### ii.   Guoqiang Gao

In the Army Phase II Contract, the U.S. points to two misrepresentations regarding key personnel.  First, LPT represented that "Guoqiang Gao, Ph.D. has been interviewed for a scientist position and is expected to join LPT once the program start[s]."  Dkt. 67, Ex. 2 at 40.  The U.S. does not argue that LPT did not interview Gao.  Instead, they argue that the statement is false because Dr. Gao never joined LPT and never did any research for LPT.  LPT, on the other hand, argues that it did actually interview Gao and wanted to hire him.  But, LPT claims that the time between the interview and the actual funding was so long that it lost the opportunity to hire Gao.  Since the fact that LPT interviewed Gao is unrefuted based on the record, that part of the claim, at least, is literally true.  However, the truth or falsity of LPT's stated intent to hire Gao is again dependent on the state of mind of the speaker.

### iii.   Mary Sukeshini

Likewise, for the second misrepresentation in Army Phase II, the U.S. quotes LPT saying "We have conducted a telephone interview with [Mary Sukeshini, Ph.D.] and if possible would like to hire her."  *Id.*  Again, the record would indicate that LPT interviewed Dr. Sukeshini, but the intent to hire her is a matter of the intent of the speaker.

     iv.    <u>Like Xie</u>

Lastly, the U.S. argues that LPT made another misrepresentation of key personnel in the Air Force Phase II proposal.  As with the other alleged misrepresentations, LPT stated that "Dr. Like Xie has been interviewed for a senior scientist position and is expected to join LPT once the program start[s]."  Dkt. 67, Ex. 4 at 39.  However, in this instance the U.S. adduced evidence that Xie was not interviewed until after the proposal was submitted.  Dkt. 67, Ex. 10.  LPT flatly contradicts this, claiming that Munshi interviewed Xie by phone.  Dkt. 84.  LPT avers Xie has forgotten.  *Id.*  Xie says in his affidavit that he had some contact prior to the proposal, but only with Longhi on behalf of LPT, not Munshi.  Dkt. 67, Ex. 10.  LPT offers email correspondence between Munshi and Xie dated after the proposal to demonstrate Xie was actively considering employment at LPT.  *Id.* at Ex. A-6.  However, both parties are clear that the in-person interview, the offer and all the ensuing correspondence took place after the proposal was submitted.  *Id.*; Dkt. 86, Ex. A.

     v.    <u>Knowledge</u>

LPT claims that in all four instances, the delay between the submission of the proposal and the funding caused it to lose the chance to hire the intended personnel.  And, there is no direct evidence in the record to show that LPT did not intend to hire these scientists.  However, "direct evidence of a person's intent to deceive is rarely, if ever, available."  *In re Powers*, No. 92-2437, 1992 WL 352557 at *2, 979 F.2d 1533 (5th Cir. 1992).  Therefore in most instances involving fraud, the "jury may infer intent to defraud from all the facts and circumstances surrounding the transaction in question."  *United States v. Rabe*, No. 00-20018, 2001 WL 274736 at *2, 250 F.3d 743 (5th Cir. 2001) (citing *United States v. Aubrey*, 878 F.2d 825, 827 (5th Cir. 1989)).

The government argues, in effect, that LPT pulled a bait-and-switch with regard to key personnel. That is to say that LPT represented that it would hire specific well-qualified scientists for each contract, but instead hired lesser qualified scientists or even non-scientists instead. In one instance, LPT simply hired no one to replace the specified key person. Attempting to follow the trail of who was hired when to work on what is byzantine at best. However, certain facts emerge upon a review of the record. First, on three out of four funded proposals, the key personnel actually hired were not the same as the key personnel in the proposals. Second, no one was hired to replace Dat Truong on the Army Phase I contract.[10] Third, the Army Phase II contract employed Ph.D.'s during less than half of the time the work on the contract was being performed.[11] Fourth, the Air Force Phase II proposal listed Dr. Gupta as key personnel, but he was fired very shortly thereafter.[12] Fifth, on August 27, 2001, Dr. Menon—one of the "replacement Ph.D's"—submitted a report in which he was critical of LPT's ethical practices with regard to (1) the integrity of the data presented to the

_____

[10] LPT claims that it hired Navor Hernandez to perform the work intended for Dat Truong on Army Phase I. Dkt. 102 at 12. However, it then describes Hernandez as having a "mechanical background," not as an engineer. *Id.* There is no doubt that if Hernandez's credentials had been nearly equivalent to Truong's, LPT would have adduced competent summary judgment evidence to that effect. It did not.

[11] Calculating that LPT represented it would hire two Ph.D.'s (Gao and Sukeshini) for the entire project, and the project took two years, then LPT represented that it would employ Ph.D's for a total of 48 months not counting Munshi. Counting the months worked by Ph.D.'s—except Munshi—during Army Phase II, the project was staffed by Ph.D.'s for 21 total months: Gupta worked 7 months, Menon worked 4 months, and Masere worked 10 months. That is approximately 43% of the total time spent on the contract. Alternatively, measuring the project as 24 months, then only 11 months out of the 24 were staffed with Ph.D.'s—except Munshi. In that scenario, the project was staffed with Ph.D.'s only 46% of the time. Either calculation results in the caliber of scientist represented in the proposal being present less than 50% of the time.

[12] The Air Force Phase II proposal is dated October 25, 2000 and lists Drs. Xie and Gupta as key personnel. Dkt. 67, Ex. 4 at 42. Gupta was terminated some time in November 2000. Dkt. 93, Ex. C ¶ 8.

government,  and (2) false billing on the contracts.  Dkt. 94, Ex. I-7 at RD-0377.  Three days later on August 30, 2001, Menon's employment with LPT was terminated for attitude problems.[13]  Dkt. 93, Ex. D at 5.  Last, Dr. Xie's phone interview with Munshi—if there was one—was so insignificant that he could not remember it.  And, that Xie's in-person interview was not conducted until after the submission of the proposal is unrefuted.  The evidence certainly suggests that LPT pursued a course of conduct in its representations regarding personnel that was reckless as to the truth of those representations.

LPT argues that it intended to hire the key personnel listed in the proposals.  If LPT had lost only one or even two people due to unforeseen circumstances, then it could be put down to bad luck or even negligence in ascertaining their availability.  However, LPT repeatedly "lost the opportunity" to hire these scientists whose background suited the programs.  And, LPT should have known enough to build in a margin for error because it was well-versed in the SBIR proposal process.[14]  But, it continued to "lose opportunities."  Summary judgment does not allow the court to weigh the credibility of the witnesses.  *See Jones*, 427 F.3d at 993.  And, the court must draw all *reasonable* inferences in favor of LPT as long as they are not improbable.  *See T.I.G.*, 276 F.3d at 759.  Based on the record before the court, there is some possibility that a reasonable jury could infer that LPT was merely negligent.  Therefore, the court must find that there is a genuine issue of material fact

---

[13]  Notably, on December 2003, LPT terminated the employment of Dr. Coowar—another "replacement Ph.D."—also for attitude problems.  Dkt. 93, Ex. E.  And, Dr. Masere—a third "replacement Ph.D."—was officially warned that he would be terminated if his attitude did not improve.  *Id.* at Ex. F.  There is no evidence in the record regarding the arguments with Munshi referenced in both Coowar's termination letter and Masere's warning letter.

[14]  LPT admitted that it had submitted at least 15 SBIR proposals by the end of 2002.  Dkt. 67, Ex. 5 at 17.

regarding the U.S.'s key personnel argument.   However, even without these particular false statements the evidence in the record shows that there is no genuine issue of material fact as to the falsity of the proposals and the scienter with which they were made when taken as a whole.

c.     *Available Facilities and Equipment*

The U.S. argues that LPT represented in Army Phase I that it already had office space, laboratories, and a "dry room."  But, in actuality, the facilities were not yet built.  In the proposal LPT stated "[t]he company occupies approximately 4000 square feet of new laboratory and office space, has a 500 square [foot] dry-room for the development and manufacture of lithium rechargeable batteries and capacitors."  Dkt. 67, Ex. 1 at 20.  The U.S. points to the fact that LPT's statements in the proposal were in the present tense.  It argues that LPT represented that it "occupies" laboratory and office space and "has" a dry-room.  Therefore, the U.S. concludes that the statement was false.  Undeniably, the statement is literally false.  In fact, there is some evidence in the record to suggest that the dry-room was not ready for quite some time after the proposal—despite LPT's statement and Munshi's affidavit to the effect that *all* of the facilities were ready when the proposal was funded.  *See* Dkt. 102, Ex. B. *But see* Dkt. 93, Ex. C-2.  As with LPT's corporate status, LPT readily admits that the buildings were not yet complete when the proposal was submitted.  Dkt. 84 at 14.  It argues instead that the facilities were in place at the time the proposal was funded.  If the question posed by the FCA was whether the U.S. got the product for which it contracted, then LPT's argument might have some traction.  But, the focus of the FCA is on the truth of the statements to the government, not the end product.  *See United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972) ("The mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the

government agency."). Therefore, the falsity of the statement is judged based on the time the statement was made. *Southland I*, 288 F.3d at 631. This is especially true when the false statements give the defendant an advantage over more deserving candidates. *Daewoo Eng'g & Constr. Co. v. United States*, 73 Fed. Cl. 547, 586 (2006) ("The Government, and indirectly the American people [are] not required to be 'saddled' with contractors who used illegal means to win their contracts.") (citing *United States v. Acme Process Equip. Co.*, 385 U.S. 138, 144-45, 87 S. Ct. 350 (1966)). And, LPT simply *must* have had actual knowledge that when it submitted the proposal, that its facilities had not yet been built. Therefore, the statement regarding the facilities that comprised LPT's offices and laboratories was literally and objectively false and made with actual knowledge of its falsity.

The U.S. also claims that LPT misrepresented the relationship it had—or did not have—with other laboratories in town. In all four contracts under the section entitled Facilities/Equipment, LPT stated that "LPT has cooperative arrangements with University of Houston and Polyhedron Laboratories regarding the use of their laboratories and scientific equipment." Dkt 67, Exs. 1 at 20, 2 at 43, 3 at 22, & 4 at 43. The U.S. adduced competent summary judgment evidence showing that LPT had no cooperative fee agreement with University of Houston or Polyhedron—except on a fee for services basis. Dkt. 67, Exs. 11-13. In a stunning display of disingenuity, LPT responds that it never claimed to have a cooperative *agreement* with those labs, but rather a cooperative *arrangement*. LPT argues that an agreement and an arrangement are very different things. Indeed, it argues that the arrangement it had was to use facilities on a fee for service basis. Interestingly, in its earlier responses to interrogatories when asked to identify all persons at University of Houston and Polyhedron with any knowledge about the "cooperative arrangements," LPT replied that "[a]round the end of 1997, Lithium Power discussed possible cooperation in SBIR research with

21

Professor Jacobsen at the University of Houston and Dr. Howard Kaye from Polyhedron." Dkt. 67, Ex. 6 at 1.  It seems to be a bigger jump from "discussing possible cooperation" to "cooperative arrangements," than from "cooperative arrangements" to "cooperative agreements."   In a different context, the Supreme Court has said "[i]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294 (1972) (quoting *Amer. Commc'ns Assoc v. Douds*, 339 U.S. 382, 412, 70 S. Ct. 674 (1950)).  However, for the court's purposes, the common understanding of the word "arrangement" should suffice.  Webster's Dictionary defines an arrangement as "an informal agreement or settlement."  WEBSTER'S NEW COLLEGIATE DICTIONARY 82 (1977).  LPT's argument—that *arrangement* and *agreement* are significantly different—simply cannot withstand common usage or even common sense.  At the time that LPT submitted the proposals, no agreement or arrangement was in place with either Polyhedron or the University of Houston beyond fee-for-service like any other member of the public. Therefore, LPT's statements regarding all of its facilities—either owned or borrowed—were factually incorrect when made.

Although it could be argued that LPT had actual knowledge that it had no cooperative arrangement with Polyhedron or the University of Houston, at the very least LPT made these statements in reckless disregard for their truth.  In his declaration, Munshi makes the following statements regarding the "cooperative arrangements."

> 23.   We never represented to anyone that we had "cooperative agreements" with the University of Houston or Polyhedron Laboratories for the use of facilities. We represented that we had "cooperative arrangements," which is a different matter. In late 1997 or early 1998, I had telephone conversations with representatives of the University of Houston and Polyhedron Laboratories in which we discussed the use of their equipment and facilities.  None of those discussions were ever reduced to an agreement or contract, and we never claimed otherwise.  We did have cooperative

arrangements, however.  Exhibit A-5 shows a letter from Polyhedron Laboratories clearly indicating that contact between Dr. Kaye [of Polyhedron] and I was made relating to the SBIR proposals we were submitting to various DoD components.

24.     During the course of our work under the various contracts, we never actually used the facilities at the University of Houston, and we used the services of Polyhedron Laboratories only a small number of times.  Our own facilities proved to be sufficient.  If we had needed those facilities, we undoubtedly would have entered into a more formal relationship.

Dkt. 84, Ex. A at 4-5.  First, as detailed above, the choice of the word "arrangement" as opposed to "agreement" is a distinction without a difference.  Second, in this statement Munshi admits that LPT had no formal "relationship" with the labs.  And yet, in all four proposals LPT states that it "has cooperative arrangements with University of Houston and Polyhedron Laboratories regarding the use of their laboratories and scientific equipment."  *See, e.g.,* Dkt. 67, Ex. 1 at 43.  As proof of LPT's arrangement with Polyhedron, it offers a letter from the director of Polyhedron.  Dkt. 84, Ex A-5.  The letter is a pricing sheet for services specific to polymeric liquids and solids.  *Id.*  Nothing in the letter suggests an arrangement/agreement other than a fee-for-service basis available to any customer of Polyhedron's.  The fact that the letter references LPT's "proposal" in no way suggests an arrangement—informal or otherwise—with Polyhedron.  *Id.*  It is purely and simply a bid for services.  And last, regardless of its relationship, if any, with Polyhedron, LPT offers nothing to show that it ever had any relationship with the University of Houston.  In its response to interrogatories, LPT claims to have "discussed possible cooperation in SBIR research with Professor Jacobsen (sic) at the University of Houston . . ."  Dkt. 67, Ex. 6 at 1.  However, Professor Jacobson states in his declaration that

To the best of my recollection, I have never conducted research with Mohammed Zafar A. Munshi or Lithium Power Technologies, Inc., nor do I recollect having

> discussions with Mr. Munshi regarding joint research between the University of
> Houston and Lithium Power Technologies, Inc.

Dkt. 67, Ex. 13.  True to form, LPT counters that it never represented that it was "conducting joint

research" with the University of Houston.  Dkt. 84.  Even if the court were to accept LPT's strained

definition of "cooperative arrangement" as something less than a "cooperative agreement"—which

it does not—this "arrangement" would still be substantial enough that Dr. Jacobson would remember

some conversation with LPT.  The fact that he does not indicates that any contact LPT had with

Jacobson was insignificant enough not to meet even LPT's definition of an "arrangement."

Therefore, the court concludes that LPT's statements regarding its "cooperative arrangements" with

both Polyhedron and the University of Houston were false at the times they were made.  And, at the

very least the statements were made with reckless disregard of their falsity, if not actual knowledge.

> d.      *Essentially Equivalent and/or Related Work - Air Force Phase I & II*

Finally, the U.S. argues that LPT misrepresented in the Air Force Phase I and II proposals

whether it had previously performed similar or related work.  There are several places in the

proposals where the applicant is asked about similar and/or previous work product.

> i.      <u>Submitted to Other Agencies</u>

The proposal cover sheets for Air Force Phase I & II  asks the applicant whether "this

proposal [has] been submitted to other US government agencies, or DoD components or other SBIR

activity." Dkt. 67, Ex. 3. On both proposals,  LPT answered in the negative. *Id.*  LPT argues that

it answered correctly, because the Army and Air Force proposals were not the *same* proposal.  And

certainly they were not identical proposals, so this is literally accurate as of the time the statement

was made.

ii.   <u>Related Work</u>

Additionally, the solicitation instructions required applicants to include a section entitled

"Related Work."  *Id.* at Ex. 8.  The instructions for that section stated:

> **Describe significant activities directly related to the proposed effort**, including
> any conducted by the principal investigator, the proposing firm, consultants, or
> others.  Describe how these activities interface with the proposed project and discuss
> any planned coordination with outside sources.   The proposal must persuade
> reviewers of the proposer's awareness of the state-of-the-art in the specific topic.
>
> **Describe previous work not directly related to the proposed effort but similar.**
> Provide the following: (1) short description, (2) client for which work was performed
> (including individual to be contacted and phone number), and (3) date of completion.

*Id.* (emphasis added).  Under the "Related Work" sections of both proposals, LPT made no mention

of the Army contracts.  *See Id.* at Exs. 3 & 4.  Interestingly, LPT makes no attempt to argue that the

proposals are not similar.  Dkt. 84.  In fact, LPT freely admits in its pleadings and in evidence

adduced for summary judgment that "the Air Force proposals were directly related to the [Army]

contracts, in that the Air Force proposals were an extension of the technology developed in

connection with the [Army] contracts."  Dkt. 84; *see also id*, Ex. A; Dkt. 93.  Instead, LPT makes

three arguments: (1) the solicitation did not require LPT to list the Army proposals, (2) the Air Force

already knew about the Army proposal, and (3) the language of the proposal solicitation and the

examples published on the government's website were so vague that LPT did not realize it should

disclose the Army proposals.  These arguments are unavailing.

First, LPT claims that the Air Force's instructions did not require LPT to list the Army

proposals.  In support of this argument, LPT quotes the full first paragraph from the instructions as

set forth above.  LPT argues that it complied with the instructions providing a short description of

its prior work.  Moreover, LPT claims that the instructions did not require the disclosure of prior

*contracts*.  Instead, LPT explains that the Related Work section "simply directed Lithium Power to persuade the reviewers of its knowledge of the state-of-the-art."  Dkt. 84.  And, the last sentence of the first paragraph of the Related Work instructions supports that interpretation to the extent that *one* of the goals of the Related Work section is for "[t]he proposal [to] persuade reviewers of the proposer's awareness of the state-of-the-art in the specific topic."  Dkt. 67, Ex. 8.  However, even accepting *arguendo* this interpretation as true, a review of LPT's Related Work sections for the Air Force Phase I and II proposals reveals that the section speaks not one word of LPT's past work in the area.  Dkt. 67, Ex. 3 at 16.  It discusses the novelty of the batteries and posits their scientific value.  It forecasts possible uses for the technology.  Finally, LPT states its intention to use polymeric materials developed by another lab.  But, notably missing is any discussion whatsoever of LPT's or Munshi's past related work in the field.  In reality, the directions clearly require LPT to disclose the Army contract, because the very first sentence of the instructions directs applicants to "[d]escribe significant activities directly related to the proposed effort, including any conducted by the principal investigator, the proposing firm, consultants, or others."  Dkt. 67, Ex. 8a.  Only an artificially cramped reading of these instructions could produce the paragraph penned by LPT.

Moreover, even if the first paragraph did not indeed require disclosure of the Army proposals, the second paragraph—artfully omitted by the defendants—leaves no doubt.  It requires the disclosure of any  previous work not directly related but similar.  Dkt. 67, Ex. 8a.  Further it specifically requires that the applicant provide a short description of the similar work and the name(s) and contact information of the client for whom the work was performed.  *Id.*  LPT admits that the work is related and its argument that the instructions did not require its disclosure is unavailing.

For its second argument, LPT presents what has come to be known as the "government-knowledge-defense."  This defense is a means by which the defendant can rebut scienter based on the government's advance knowledge that the claim is false.  *Southland II*, 326 F.3d at 682 n.8.  However, in the Fifth Circuit, government knowledge does not automatically vitiate an FCA claim.  *See United States ex rel. Barret v. Johnson Controls, Inc.*, No. 3:01-CV-1641-M, 2003 WL 21500400 (N.D.Tex. Apr. 9, 2003) ("Thus, if the [government knowledge] principle applies in this Circuit, it does so only in the rare circumstance when the government effectively directs the defendant to make the statement alleged to be false.").  In *Southland I*, the court explained that while some of its sister circuits had recognized the defense, it found "it difficult to justify the proposition that an individual who submits a false claim to the government with knowledge of its falsity should necessarily be excused from liability under the Act merely because the government was also aware that the claim was false when it was submitted."  *Southland I*, 288 F.3d at 686.  Moreover, the court explained that even those circuits that allowed the defense did not see it as an automatic bar.  *Id.* (citing *Kreindler*, 985 F.2d at 1156-57; *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F. 2d 1416, 1421 (9th Cir. 1991)).  "[D]efendant's knowledge of the falsity of its claim . . . is not automatically exonerated by any overlapping knowledge by government officials."  *Kreindler*, 985 F.2d at 1156.  So, for LPT to successfully use the defense, it must show that the government not only knew about the Army Phases I & II proposals, but that it directed LPT to disregard the solicitation instructions and not disclose the prior related work.

LPT argues that the Air Force knew about the prior research and therefore LPT did not need to disclose it.  In Munshi's affidavit, he testifies that he gave two presentations to the Air Force regarding his work on Army Phase I.  Dkt. 84, Ex. A.  The first presentation was in March 1999 at

Eglin Air Force Base in Florida. *Id.* There he discussed further development of the technology with

Scott Roberson[15] and Captain Jeffries of the Air Force. The second presentation was at Wright-

Patterson Air Force Base where he discussed MEMS sensor technology with David Ryan, who

would later be the technical reviewer on his Air Force Phase I proposal. *Id.* As proof of the Air

Force's knowledge LPT points to a letter dated October 14, 1999 Munshi sent to Dr. Richard Marsh

at Wright-Patterson Air Force Base along with attached information regarding batteries. Dkt 84, Ex.

A-3 & A-4. The letter informs Marsh that Munshi will be coming to Wright-Patterson Air Force

Base in November to give a presentation. And, in the information, Munshi references the fact that

the battery technology is being developed "with partial assistance from BMDO under an SBIR

Program." *Id.* at A-4. Additionally, LPT references a letter that Munshi wrote to Ryan in January

of 2000 as a follow-up to the presentation.[16] The letter states:

> Dear David:
>
> I just wanted to take this opportunity to thank you for participating in the battery presentation I made at WPAFB last November. You wanted to see an SBIR proposal from our Company and I did manage to submit one on the solid-state lithium polymer electrolyte battery for MEMS and other applications, entitled "High Energy Density Micro-Power Sources".
>
> Please look out for it. I believe if any technology is going to be truly feasible for microsensors, it has to be based on a solid-state technology. Thanks and I hope we can work on the project together if we can obtain the contract. Best wishes.
>
> Yours sincerely,
> M. Zafar A. Munshi, Ph.D.

---

[15] Scott Roberson was the Team Leader and Research Engineer at the Intelligent Fuzing-Air Force Laboratory at Eglin Air Force Base who reviewed LPT's Army Phase I proposal. Dkt. 67, Ex. 14.

[16] The date on the letter is October 14, 1999, but according to Munchi's affidavit, that is in error. Dkt. 102, Ex. B. The actual date is January 12, 2000. *Id.*

President

Dkt. 102, Ex. B-2. Ryan has no recollection of attending the presentation. Dkt. 93, Ex. H. LPT also

argues that Munshi's email to Captain Jefferies at Eglin Air Force Base regarding the Army Phase

I report and Army Phase II proposal shows knowledge on the part of the Air Force. Dkt. 84, Ex. A-2.

Even if the court credited all of LPT's evidence of the Air Force's alleged knowledge, it shows only

overlapping knowledge on the part of the Air Force. And, that is simply not enough to negate

knowledge under the government-knowledge-defense as interpreted in this circuit.

For its last argument, LPT claims that it "did not understand the instructions to require the

disclosure of prior contracts, and in fact the instructions contain no such requirements." Dkt. 84 at

34. LPT further argues that the solicitation instructions are vague, and therefore reasonable minds

could differ over what should be included. *Id.* The court disagrees. The solicitation instructions

direct applicants to disclose both "activities directly related to the proposed effort" and "previous

work not directly related to the proposed effort but similar." Dkt. 67, Ex. 8a. LPT must have

thought that the Army Phase I project was sufficiently similar for Munshi to send an abstract about

it to Dr. Marsh in his October 1999 letter. Dkt. 84, Ex. A-3. LPT must have thought the

technologies were sufficiently related to list its Army Phase II contract in its commercialization

report for the Air Force Phase II report. *Id.*, Ex. A ¶ 16. Moreover, Munshi describes the Air Force

project as "a further development of the technology that we had used in the [Army] contracts," an

extension of the Army technology to MEMS application, and having some common elements. *Id.*

at ¶¶ 12, 16, 39, 42 & 43. And yet, LPT invites the court to believe that it did not know it should

disclose the Army contracts because they were not sufficiently related, or alternatively, that LPT did

not understand the meaning of either "activities directly related" or "previous work not directly

related but similar." The court declines the invitation. If LPT did not understand the instructions in the solicitation, then its struthian behavior is the paradigm of "deliberate ignorance of the truth or falsity of the information" identified in the statute. *See* 31 U.S.C. § 3729(b)(2). Accordingly, LPT knowingly made false statements when it failed to disclose the Army Phase I & II contracts in the Related Work section of the Air Force Phase I & II proposals.

               iii.    <u>Similar Proposals or Awards</u>

The solicitation  instructions further directed applicants to include a section entitled "Prior, Current, or Pending Support of Similar Proposals or Awards" as follows:

> *Warning* – While it is permissible, with proposal notification, to submit identical proposals or proposals containing a significant amount of essentially equivalent work for consideration under numerous federal program solicitations, it is unlawful to enter into contracts or grants requiring essentially equivalent effort. **If there is any question concerning this, it must be disclosed to the soliciting agency or agencies before award.**
>
> If a proposal submitted in response to this solicitation is substantially the same as another proposal that has been funded, is now being funded, or is pending with another Federal Agency or DoD Component or the same DoD Component the proposer must so indicate on Appendix A and provide the following information:
>
>           •             •            •
>
> *Note: If Section 3.4.1 does not apply, state in the proposal "No prior, current or pending support for proposed work."*

*Id.* at Ex. 8 (some emphasis added). Under the "Similar Proposals and Award" sections of both Air Force Proposals, LPT wrote "No prior, current, or pending support for proposed work." Dkt. 67, Exs. 3 & 4. The U.S. argues that the Air Force proposals were similar enough to the Army proposals to trigger disclosure. The language of the instructions calls for disclosure of work that either (1) is identical, or (2) contains a significant amount of essentially equivalent work. Dkt. 67, Ex. 8a. The U.S. does not argue that the work is identical. Instead, it argues that the work was essentially

equivalent or at least related enough to trigger disclosure.  In support of this claim, the U.S. points

to a series of similarities between the proposals.  First, the technical objectives of both reports are

strikingly similar.  LPT describes  the language of the two sections as "boilerplate" and admits that

they contain "similar language."[17] Dkt. 84, Ex. A.  However, LPT argues that the proposals involved

different types of batteries with different specifications and different production processes.  *Id.*

Second, the U.S. argues that the deliverables under Army Phase II and Air Force Phase II were

essentially identical.  Dkt. 67.  Below is the deliverables language from Army Phase II.  Phrases and

words not present in Air Force Phase II are bolded.  Language from Air Force Phase II is in brackets

where it would appear.

> In addition to the final report, periodic **monthly** reporting will be made with the
> contracting technical monitor to apprise on the progress.  It is expected that in the
> latter half of the project, **sufficient full-size, 18650** [a sufficient number of] solid-
> state lithium polymer electrolyte battery prototypes will be fabricated and at least **25**
> [50] samples of the best prototypes will be provided to the agency for independent
> evaluation of performance.  We will also make a determined effort early in the
> program to provide the agency, a few good quality, but very thin film small size-
> small footprint lithium polymer batteries which they could test in some MEMS
> application.  In this case we will contact the appropriate personnel at the agency for
> systems requirements before constructing these cells.

*Compare* Dkt. 67, Ex 2 at 27 *with* Dkt. 67, Ex. 4 (punctuation and grammar errors in original).

Despite the admitted similarities between the two proposals, LPT argues that "the government's

arguments . . . are based on superficial similarities," and "[a] substantive review of the contracts

reveals that the government is simply wrong."  Dkt. 84.  Both sides present distinguished experts to

give credence to their arguments regarding the similarities of the proposals.  *See* Dkts. 94, Ex. E &

---

[17] LPT admits that "during the summer of 2002, LPT submitted at least 15 SBIR Phase I
proposals to various government agencies."  Dkt. 67, Ex. 5 at 17.  Some similarity among the
proposals was inevitable.

84, Ex. E.  Without being able to assess the credibility of the two experts, it is nearly impossible to ascertain whether the projects are as the U.S.'s expert argues significantly similar, or are closer to LPT's expert evaluation and merely normal, acceptable, and not significant by any measure. Because the court is in no position to determine if the proposals contained essentially equivalent work, at this point LPT's failure to disclose the Army proposals to the Air Force cannot be determined to be true or false.

### 4.    That Was Material

"The accepted definition of materiality for civil FCA claims, as for other federal statutes, equates materiality with 'ha[ving] a natural tendency to influence or [being] capable of influencing, the decision of the decision making body to which it was addressed.'" *N. Am. Constr.,* 173 F. Supp. 2d at 618 (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S. Ct. 1537 (1988)).  To demonstrate that LPT's false statements were material, the U.S. provided the declarations of the scientists who evaluated the Army Phase I and Air Force Phase I proposals.  The Army Phase I contract was evaluated by Scott Roberson.  Roberson states in his declaration that he generally considers proposals in their entirety and that factors beyond the work the applicant sought to perform play a role in the evaluation process.  Dkt. 67, Ex. 14. The picture that he received of LPT based on its whole proposal was of an experienced company with its own laboratory space, and cooperative arrangements with the University of Houston and Polyhedron Laboratories.  *Id.*  In his declaration, he further stated that "[a]ny variation as to what was presented to me in the proposal would have changed my evaluation."  *Id.*  He went on to list five factors that influenced his decisions.  *Id.*

1.  LPT was incorporated;
2.  LPT had been in business since 1992;[18]
3.  LPT had 4,000 square feet of "occupied" laboratory space and a 500 square foot dry room,
4.  LPT had cooperative agreements with the University of Houston and Polyhedron Laboratories to be able to use their laboratories and scientific equipment, and
5.  LPT had employee(s) to assist in the laboratory research and fabrication of the deliverables.

*Id.* Notably, four out of five of his listed factors can be determined for summary judgment purposes to have been knowingly false. Additionally, Roberson attached the evaluation form and memorandum regarding the proposal that he submitted at the time. *Id.* at 14(a). The attached memorandum mentions that "[t]he company has adequate facilities to conduct this project."[19] *Id.*

LPT argues that Roberson was not the final authority regarding the funding of the contract. It claims that Jeff Bond—the SBIR Program Manager for the BMDO—was the person who made the ultimate decision regarding funding. In Bond's declaration, he stated that he alone could make the decision to fund a contract. Dkt. 84, Ex. D. Further, he stated that factors such as incorporation and business history are not proper evaluation criteria and did not influence his decision to fund LPT's proposal. *Id.* He argued that Roberson should not have looked to other factors outside the

---

[18] LPT argues that in Army Phase II and Air Force Phase I and II it corrected the founding date to read 1998 and still received funding. Therefore, LPT reasons that the founding date of 1992 in the Army I proposal could not have been material. However, what the reviewers thought when they approved the later contracts has no bearing on what the reviewer thought when he evaluated the first proposal.

[19] The memorandum is actually written by Walter O. Maine, Chief of the Munitions Division. Dkt. 67, Ex. 14(a). Although he is not mentioned by either party, he clearly was another reviewer of LPT's proposals, and specifically cited LPT's facilities as a factor in his evaluation. *Id.*

official evaluation criteria.[20]  *Id.*  However, his deposition clarifies his role in the selection process. First, Bond processed approximately 400 proposals per year.  Dkt. 93, Ex. A-5.  He did not have technical expertise in all of the areas in which proposals were submitted, and not in the particular area of batteries.  *Id.* at Ex. A-7 & A-8.  He had a pool of 300 or so evaluators to whom he would assign proposals for evaluation.  *Id.* at A-5.  Notably, he admitted that he relied strictly on his evaluators with respect to funding the LPT proposal.  *Id.* at A-8.  Additionally, Bond agreed that the history and connections of an applicant can "beef up" the credentials of a company.  *Id.* at A-4.  And, Bond stated that if Roberson said that he was influenced by certain factors, then Roberson was telling the truth.  *Id.*  In fact, Bond admitted that evaluators would look at the proposal as a whole when making their recommendations.[21]  *Id.* at A-2.  Finally, Bond stated that not only does he rely strictly on his evaluators, he has never funded a proposal when the evaluators did not recommend the project.  *Id.* at A-6.  Therefore, although Bond had the ability to actually fund the contract, he played little role in the technical evaluation of the proposal.  Since Roberson was influenced by LPT's misrepresentations, and Bond would have been influenced by Roberson's recommendation, Bond was influenced—albeit indirectly—by LPT's misrepresentations.  Even if—as Bond states in his declaration—Roberson should not have considered criteria like corporate history and facilities,

---

[20]  LPT argues in several different contexts that the allegedly false information was not required and therefore not material.  Whether they were required statements, they were nonetheless made in an effort to sway the reviewers.  And, if the statements did sway the reviewers then they are material, required or not.

[21]  Bond stated that he did not disagree with the current program administrator's assessment of the evaluation process.  Dkt. 93 at A-3.  The present administrator—Michael Caccuitto—describes the factors that reviewers take into consideration when evaluating proposals, including facilities and equipment, owned or borrowed by agreement, and similar or related work. Dkt. 67, Ex. 8.  Because the reviewer does not have time to verify the information in a proposal, it is imperative that the applicants' proposals be completely truthful.  *Id.*

the standard for materiality is whether those factors *could* influence the decision maker, not whether they *should*.  Accordingly, LPT's misrepresentations on the Army Phase I were material.

The evaluator for the Air Force Phase I and II proposals was Dr. David Ryan.  In Ryan's declaration, he makes clear that he also evaluated the proposals as a whole, including the same factors listed by Roberson. Dkt. 67, Ex. 15.  He made special mention of the cooperative agreements with the University of Houston and Polyhedron as something that impressed him extremely.  *Id.* Additionally, he understood that the proposal was unique and novel and based his recommendation, in part, upon that understanding.  *Id.*  Before making his declaration Ryan reviewed the Army contracts.  *Id.*  He stated that the two proposals were similar enough that if LPT had disclosed the Army contracts, Ryan would not have recommended funding the Air Force contracts.  *Id.*  Therefore, LPT's omission in not disclosing its Army contracts was crucial and material to the decision to fund the Air Force Phase I and II.  Accordingly, the U.S. has offered ample summary judgment evidence that the misrepresentations not only could have been material, but were actually material.

5.   Damages

Lastly, LPT argues that it cannot be liable under the False Claims Act because the government "got what it paid for" and therefore suffered no damages.  LPT argues that the U.S. is using the fraudulent inducement theory to avoid the damages question altogether.  However, damages are not a necessary element for any type of successful FCA claim—fraudulent inducement or not.  *Rex Trailer Co. v. United States*, 350 U.S. 148, 152-53 (1956); *United States v. Miller*, 645 F.2d 473 (5th Cir.1981); *see also Columbia/HCA*, 20 F.Supp.2d at 1047  *Accord United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1203 (10th Cir. 2006);*Harrison*, 176 F.3d at 785; *United States v. Hughes*, 585 F.2d 284, 286 n.1 (7th Cir. 1978).  Therefore, this argument fails.

## IV.   CONCLUSION

The government has unquestionably carried its burden of proof, even under the movant's difficult summary judgment standard, on several false statements contained in the contracts.  For example, LPT misrepresented its history and status on the Army Phase I proposal.  Also on the Army Phase I proposal, LPT misrepresented the physical facilities that it had.  On all four proposals, LPT continuously misrepresented the arrangements—or lack thereof—between itself and Polyhedron Laboratories, and itself and the University of Houston.  On the Air Force Phase I and II, LPT misrepresented the amount of related work it had performed prior to the Air Force proposals when it did not disclose the prior Army contracts.  At one point in its motion LPT argues that the U.S. has made a mountain out of a group of small molehills.  But, that encapsulates exactly the overall misrepresentation that LPT made in its proposals.  It embellished a whole series of molehills so it could present a mountain of experience, facilities, and novelty to attract the reviewers.  All of this was done with at least reckless disregard for the truth of the statements, and in some cases actual knowledge.  The court finds that the defendants made false claims in violation of sections 3729(a)(1) and (2) on the contracts designated as Army Phase I, Air Force Phase I, and Air Force Phase II.  Therefore, the invoices based on all four contracts at issue here are "false claims" based on a fraudulent inducement theory.

Accordingly, for the foregoing reasons, the plaintiffs' motion for partial summary judgment is GRANTED.  Dkt. 68.

In light of the court's ruling here, defendants' cross-motions for partial summary judgment are DENIED.  Dkts.  83 & 89.

The court will issue a scheduling order for briefing on damages and deadlines for those claims not resolved here concurrent with this opinion.

It is so ORDERED.

Signed at Houston, Texas on September 27, 2007.

_____
Gray H. Miller
United States District Judge