# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

UNITED STATES OF AMERICA,     §
*EX REL.* ALFRED J. LONGHI, JR.,     §
    §
    *Plaintiffs,*     §
    §
v.     §     CIVIL ACTION H-02-4329
    §
LITHIUM POWER TECHNOLOGIES, INC.,     §
AND MOHAMMED ZAFAR A. MUNSHI,     §
    §
    *Defendants.*     §

## MEMORANDUM OPINION AND ORDER

Pending before the court are the plaintiffs' motion for summary judgment on damages, and defendants' cross-motion for summary judgment on damages. Dkts. 110 & 112. On September 27, 2007, the court granted partial summary judgment for the plaintiffs on their claims against Lithium Power and Mohammed Zafar A. Munshi ( collectively "LPT") for violations of the False Claims Act, 31 U.S.C. §3729(a), on four contract proposals ("the Four Contracts")[1] under the Department of Defense's Small Business Innovation Research Program. Dkt. 107. The parties have not moved for summary judgment on the merits of the plaintiffs' remaining claims. Therefore, the damages at issue in this order are limited to those stemming from the fraudulent inducement of the Four Contracts.

---

[1] Those contracts are: (1) "Army Phase I" - ARMY-8630: F08630-98-C-0066-P00001, Very Thin Rechargeable Battery; (2) "Army Phase II" - ARMY-0018: DAS60-00-C-0018, Very Thin Rechargeable Battery; (3) "Air Force Phase I" - USAF-2122: F33615-C-2048, Micro Electrical Mechanical - MEMs; and (4) "Air Force Phase II"  USAF-2048: F33615-01-C-2122, Micro Electrical Mechanical - MEMs.

## I.   BACKGROUND

The court incorporates by reference its order granting partial summary judgment on the government's claims.  Dkt. 107.  At the conclusion of its order, the court wrote as follows:

> The government has unquestionably carried its burden of proof, even under the movant's difficult summary judgment standard, on several false statements contained in the contracts.  For example, LPT misrepresented its history and status on the Army Phase I proposal.  Also on the Army Phase I proposal, LPT misrepresented the physical facilities that it had.  On all four proposals, LPT continuously misrepresented the arrangements—or lack thereof—between itself and Polyhedron Laboratories, and itself and the University of Houston.  On the Air Force Phase I and II, LPT misrepresented the amount of related work it had performed prior to the Air Force proposals when it did not disclose the prior Army contracts.  At one point in its motion LPT argues that the U.S. has made a mountain out of a group of small molehills.  But, that encapsulates exactly the overall misrepresentation that LPT made in its proposals.  It embellished a whole series of molehills so it could present a mountain of experience, facilities, and novelty to attract the reviewers.  All of this was done with at least reckless disregard for the truth of the statements, and in some cases actual knowledge.  The court finds that the defendants made false claims in violation of sections 3729(a)(1) and (2) on the contracts designated as Army Phase I, Air Force Phase I, and Air Force Phase II.[2]  Therefore, the invoices based on all four contracts at issue here are "false claims" based on a fraudulent inducement theory.

*Id.*  Having found liability on the Four Contracts, the court now moves to the question of the damages to be assessed against LPT.

### ANALYSIS

This seemingly simple inquiry presents the court with a novel issue of law.  The Fifth Circuit has not addressed the proper way to calculate damages for a fraudulently induced research grant—nor for that matter has any other Circuit court.  In fact, there does not appear to be any one specific standard for damages under the FCA.  *See, e.g., United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922 (4th Cir. 2003).  Instead, courts have used

---

[2]  Each Phase I contract was a prerequisite for Phase II funding.  Dkt. 107.

several different damage models—adapting them to the facts of the case.  *See, e.g., Morse Diesel Int'l, Inc. v. United States*, ___ Fed. Cl. ___, 2007 WL 3277293 (Fed. Cl. 2007) (pagination not available).  A logical starting point seems to be to examine the language and underlying purpose of both the False Claims Act itself and the government program through which the funds were channeled—in this case the Small Business Innovation Research Program.  Then, having established a frame of reference, the court can determine which model best suits the damages caused by LPT's misrepresentations.

## I.      False Claims Act

Sometimes called the Abraham Lincoln Act, the False Claims Act became law in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War."  132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman).  In 1986,[3] finding that fraud had become an even more pervasive and costly problem—approximately $10 to $100 billion annually—Congress again turned to the FCA as its "primary litigative tool for combatting [sic] fraud."  S. REP. NO. 99-345, at *3 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266-67.  As the Senate Report went on to point out, "[t]he cost of fraud cannot always be measured in dollars and cents . . . fraud erodes public confidence in the Government's ability to efficiently and effectively manage its programs."  *Id.*  In order to make the FCA a more effective deterrent, the report concluded that the Act needed better incentives for

---

[3] A little more than five score years later.

3

relators combined with harsher penalties for violators.  *Id.*  And, based on the available statistics, the 1986 amendments have certainly achieved their goal.[4]

The court has previously addressed two of the three main areas Congress enhanced in the 1986 amendments: the incentive to the relator, and the level of knowledge required for liability. Dkts. 101 & 107.  In this motion, the court must now address the third area enhanced by the 1986 amendments: the penalty scheme.  The FCA clearly delineates two separate calculations, which comprise the amount of a violator's liability.  31 U.S.C. § 3729(a).  First, the court must assess a civil penalty of not less than $5,500 and not more than $11,000 for each instance.[5]  *Id.*  And second, the court must award "3 times the amount of damages which the government sustains because of the act of that person."  *Id.*  The Supreme Court has described the purpose of the treble damages plus civil penalty framework as making "sure that the government would be made completely whole." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943).  At base, the FCA is an aggressive Congressional plan to recover money defrauded from the government, including the costs to recover the defrauded money, in such a way as to be a deterrent to others.

---

[4]  According to the Department of Justice, as of September 30, 2003, the United States had recovered in excess of 12 billion dollars since Congress passed the 1986 amendments.  Press Release, Department of Justice, Justice Dept. Civil Fraud Recoveries Total $2.1 Billion for FY 2003; False Claims Act Recoveries Exceed $12 Billion since 1986 (Nov. 10, 2003) *available at* http://www.usdoj.gov/opa/pr/2003/November/03_civ_613.htm (last visited Dec. 19, 2007). Moreover, the number of qui tam cases filed jumped from 33 in the year 1987 to 326 in the year 2003—an increase of over 900%.  Taxpayers Against Fraud Education Fund, The False Claims Act Legal Center, Statistics, http://www.taf.org/statistics.html (last visited Dec. 19, 2007).

[5]  Prior to August 30, 1999, the minimum and maximum penalties were $5,000 and $10,000 respectively.  *See* 28 C.F.R. § 85.3(a)(9) (2007).  Any civil penalties assessed by the court for instances occurring before August 30, 1999 will use the penalty range in force at the time.

## II.    Small Business Innovation Research Program

The Small Business Act came into being in 1953.  Act of Jul. 30, 1953, ch. 282, 67 Stat. 232 (codified at 15 U.S.C. §§ 631 et seq.).  Under the current law, Congress describes the policy underlying the Act as follows:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation.

15 U.S.C. § 631(a).[6]  In 1958, Congress amended the Small Business Act and added what has come to be known as the Small Business Innovation Research Program.  *See* Pub. L. No. 85-536, § 2[9], 72 Stat. 391 (codified at 15 U.S.C. § 638).  Congress found that federal research projects went primarily to large firms which in turn led to large federal procurement contracts going to those same large firms who had developed products from those federal grants.  S. REP. NO. 85-1714 (1958), *reprinted in* 1958 U.S.C.C.A.N 3071, 3076.  The goal of the amendment was to help small businesses obtain government research contracts.  *Id.*  Congress reasoned that more government research and development contracts going to small businesses would in turn lead to more government procurement contracts and more opportunity in the market as a whole for small businesses.  *Id.*  The declaration of policy in the current version of the SBIR reflects these goals.

> Research and development are major factors in the growth and progress of industry and the national economy. The expense of carrying on research and development programs is beyond the means of many small-business concerns, and such concerns are handicapped in obtaining the benefits of research and development programs

---

[6]  In 1980, Congress made an even stronger policy statement when it declared that it is the "policy and responsibility of the Federal Government to use all practical means and to take such actions as are necessary . . . [to] foster the economic interests of small businesses."  15 U.S.C. § 631a.

conducted at Government expense. These small-business concerns are thereby placed at a competitive disadvantage. This weakens the competitive free enterprise system and prevents the orderly development of the national economy. **It is the policy of the Congress that assistance be given to small-business concerns to enable them to undertake and to obtain the benefits of research and development in order to maintain and strengthen the competitive free enterprise system and the national economy**.

15 U.S.C. § 638(a) (emphasis added).

Ironically, today's SBIR is big business.[7]  In the fiscal year 2007, the Department of Defense alone funded approximately $1.14 billion in SBIR programs.  *See* Department of Defense, Small Business Innovation Research & Small Business Technology Transfer, Overview, http://www.acq.osd.mil/osbp/sbir/overview/index.htm (last visited Dec. 19, 2007).  Considering the funds funneled annually into research performed by small businesses, the SBIR has remained true to its stated purpose, allowing small businesses to compete on a level playing field with large research firms and universities.

## III.    Damages

As discussed above, the FCA does not specify how courts should calculate "the amount of damages which the government sustains because of the act of" the person found liable.  31 U.S.C. § 3729(a).  However, case law gives the basic conceptual starting point.  The Fifth Circuit has held that damages are limited "to the amount that was paid out by reason of the false claim."  *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1011 (5th Cir. 1972).  The D.C. Circuit has restated this proposition as "only those damages that would not have come about if the defendant's

---

[7]  A Google search of the term SBIR retrieves approximately 9 commercial websites—just in the first page of results—touting winning strategies for procuring SBIR funding.  For example: www.sbir-sttrgrantshelp.com, www.SBIRcoach.com, and www.sbirworld.com.  *See*, Google, Web Search, http://www.google.com/search?hl=en&q=SBIR (last visited Dec. 28, 2007).

misrepresentations had been true." *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 204 (D.C. Cir. 1995) (citing *United States v. Miller*, 645 F.2d 472, 475-76 (5th Cir. 1981)). For example, in *Aerodex* the Navy contracted with Aerodex for a specific type of bearings. *Aerodex*, 469 F.2d at 1006. Instead Aerodex supplied the Navy with inferior bearings that had been reworked to look like the correct type of bearings. *Id.* When the substitutions were discovered, the Navy spent approximately $160,000.00 removing the inferior bearings from planes in which they were installed and replacing them. *Id.* The court reasoned that the punishable act was the actual presentment of an invoice for specific bearings that the government did not receive. *Id.* at 1011. Since the Fifth Circuit requires a direct causal nexus between the actual false statement and the damage sustained by the government, any consequential damages due to the reworking could not be assessed as part of the damages under the FCA.[8] *Id.* ("The submission of these vouchers was not the cause of the government's consequential damages. The delivery and installation of the bearings in the airplanes, not the filing of the false claim, caused the consequential damages."). Put another way, if Aerodex had submitted invoices that reflected the correct part number and that the bearings were reworked, the government's remedy would not lie in the False Claims Act at all. Although, the Fifth Circuit has not had an opportunity to address the method for calculating actual damages since the FCA was amended, it is likely that it will continue to use the proximate cause model. In the instant case, the court has already determined that the false statements in LPT's proposals were actually material. Dkt. 107 at 32-35. Therefore, a direct causal relationship exists between all funds received under the Four Contracts and LPT's false statements.

---

[8] The court did, however, allow recovery of the consequential damages under a breach of warranty theory. *United States v. Aerodex*, 469 F.2d 1003, 1011-12.

7

A.        **Benefit of the Bargain Theory**

The defendant urges the court to adopt a benefit of the bargain approach to damages in this case.  LPT's argument is very simple: the government got what it paid for and was therefore not damaged.[9]  And, there is some case law to support this concept.  *See, e.g., Harrison*, 352 F.3d at 923; *United States ex rel. Stebner v. Stewart & Stevenson*, 305 F. Supp. 2d 694, 701 (S.D.Tex Jan. 30, 2004); *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429 (1994).  *But cf. Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 n. 3 (Fed. Cir. 1994) (upholding the  lower court's finding that the government sustained actual loss when it was "denied the use of the overpaid money.").  In most of the cases where courts found that the government had gotten the benefit of its bargain, the contract at issue was some type of procurement contract the end product of which was tangible and had value to the government.  *See, e.g., United States v. Bornstein*, 423 U.S. 303, 96 S. Ct. 523 (1976) (radio kits); *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637 (6th Cir. 2002) (helicopters); *Stebner*, 305 F. Supp. 2d at 701 (trucks with non-corrosive treatment); *Ab-Tech*, 31 Fed. Cl. at 431-32 (data processing system).  In some instances, the goods were conforming and accepted by the government, but due to collusive bidding or under-delivery the government was overcharged.    Under those circumstances, many courts have measured damages as the difference between what the government paid for the items or services and what the government should have paid.  *See, e.g., United States v. Coop. Grain & Supply Co.,* 476 F.2d 47, 61-65 (8th Cir. 1973); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966).  In other procurement cases, when goods were non-conforming, the

_____

[9]  The government sought, and the court granted, summary judgment based solely on a theory of fraudulent inducement.  Dkt. 107.  Therefore, the court assumed for the sake of argument that the invoices were accurate.  However, the court made no findings with regard to the accuracy of the invoices and as explained later in this opinion, its adoption of the fraudulent inducement theory should not be regarded as such.

courts have fashioned appropriate damages based on the facts of the case and the value of the end-product received. *See Aerodex*, 469 F2d. at 1006 (allowing recovery of full amount of contract for unusable non-conforming goods); *Faulk v. United States*, 198 F.2d 169, 172 (5th Cir. 1972) (damages included a estimate of the amount of sub-standard milk left in soldiers' glasses on the mess hall tables). The Fifth Circuit has recognized that whatever damage model a court chooses, it must provide some type of deterrent. *Faulk*, 198 F.2d at 172 ("Under [appellant's suggested jury instruction on damages] appellant would not have risked losing anything by his misconduct except the illegal profit to which he was never entitled anyway, while had he never been brought to account for his fraud he would have been free to enjoy his unlawful gains with impunity.").

However, the benefit of the bargain analysis cannot completely relieve a defendant from actual damages. In *United States v. Bornstein*, the defendant had already made compensatory payments to the government. *Bornstein*, 423 U.S. at 314. Defendant argued that all compensatory payments should be subtracted before the damages were multiplied. *Id.* The Supreme Court disagreed and held that the total or gross amount of damages should first be doubled (now tripled) and only then should any compensatory payments or set-offs be subtracted. *Id.* at 316. The Court explained that this method would (1) help compensate the government for the "costs, delays, and inconveniences occasioned by fraudulent claims"; (2) keep penalties consistent among violators guilty of similar acts; and (3) prevent violators from avoiding damages by simply paying the government back at any time before judgment. *Id.* at 315-16. Therefore, even if the court agreed with LPT's argument that the government got what it paid for—which it does not—*Bornstein* holds that the total amount paid out under the four contracts must first be tripled, and only then whatever

value the government received from LPT under the Four Contracts would be subtracted.[10]  The Fifth

Circuit agrees.  *See United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983) ("The damages must

be doubled [now tripled] and then reduced by the amount of any previous payments on the claim.").

Moreover, this damage model holds true even when the claims at issue are not for procurement

contracts.  *See United States ex rel. Purcell v. MWI Corp.*, ___ F. Supp. 2d ___, 2007 WL 3287443

(D.D.C. Nov. 6, 2007) ("The math my be tricky, but the case law is simple: fraudulently induced

government loans (even if eventually repaid in full) are part of the original loss to the government.")

(citing *Bornstein*, 423 U.S. at 316; *United States v. Globe Remodeling Co.*, 196 F. Supp. 652

(D.Vt.1960) (insurance); *United States v. Ekelman & Assocs., Inc.*, 532 F.2d 545, 550 (6th Cir.1976)

(mortgage loans); *United States v. Hill*, 676 F.Supp. 1158, 1182 (N.D. Fla. 1987) (guaranteed bank

loans); *United States v. Heck*, No. 86-0875 (SSB), 1987 WL 49253, at *6 (D.N.J. Mar.26, 1987)

(mortgage loans)).    Accordingly, the question really becomes what was the benefit of the

government's bargain with LPT.

### B.      The Benefit of the Government's Bargain

Assuming for the sake of argument that the four contracts were standard procurement

contracts and damages could be measured using some type of *quid pro quo*, the government has not

---

[10]  Notably, the *Bornstein* case has been cited by other courts for the proposition that "[t]he Government's actual damages are equal to the difference between the market value of the [items under contract] it received and retained and the market value that the [items] would have had if they had been of the specified quality." *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646 (6th Cir. 2002); *United States v. TDC Mgmt.*, 288 F.2d 421, 428 (D.C.Cir. 2002); *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1372 (Fed. Cir. 1998).  However, this comment on the part of the Court is dicta as evidenced by both its placement in a footnote and its reference without disparagement to two Fifth Circuit cases where the court did not use this formula.  *Cf. United States ex rel. Fago v. M&T Mortgage Corp.*, ___ F. Supp. 2d, 2007 WL 2840412 at *17 (D.D.C. Oct. 2, 2007).  Unsurprisingly, neither the Fifth Circuit nor any district court in the Fifth Circuit has ever cited *Bornstein* for this proposition.

received the benefit of its bargain for two main reasons.  First, the contracts produced no tangible benefit to the government.  A standard procurement contract is usually an agreement for an end product like the construction of a bridge, or delivery of a specific widget.  In those cases, although the bidding may have been tainted in some way or the cost overruns may have been fraudulent, at the end of the day, the government owned a bridge or some widgets.  Under a standard benefit of the bargain model, the government should not be able to keep its bridge or widgets—assuming they are conforming—and get damages for the entire amount it paid.  RESTATEMENT (SECOND) OF TORTS § 549.  Here, however, there is no tangible end product belonging to the government.  As explained in the court's previous order, the SBIR program consists of three phases.  Dkt. 107 at 1-2.  In Phase III, the small business must obtain its own funding and take its product to market.  15 U.S.C. §§ 638(e)(4)(C) & 638(r); *see also* Dkt. 67, Ex. 8 at 1.  The batteries developed through the SBIR funding belong to LPT—not the government.  *Id.*  And, as evidenced by its own statements in its proposals and final reports, LPT had every intention of marketing those batteries to the government and private industry.  *See, e.g.,* Dkt. 67, Ex. 2 at 6 ("The time is ripe to exploit our advances in a market-driven battery that tentuples [sic] the energy per dollar of a rechargeable battery."); *see also* Dkt. 67, Ex. 1 at 17 ("LPT's strategy and goals in the commercialization of this product will be first to obtain adequate patent protection on its ideas, processes and developments," then to manufacture the batteries for the BMDO and other small niche markets, and last to license the technology to "the larger commercial and military sectors for applications such as space use, weaponry, consumer portable electronics and electric vehicles . . . ."); Ex. 2 at 32 (listing potential markets as cellular phones, laptops, handheld devices, geophysical equipment, and medical devices); and Ex. 3a at 42 (In addition to the Air Force, "our immediate customers will be Micromodular Data Solution, Inc.

(San Jose, CA) and Telpus Groups for credit card size batteries; Cyberfinders for smart watch with telecommunications capabilities; and Stanford University for Mesicopter batteries and an interest from Rujisink, a German company, for micro model airplanes and model helicopters."). Therefore, even if the court treated this contract like a standard procurement contract—which it most distinctly is not—the defendants would be liable for all sums paid out under all four contracts for the simple reason that the government has no tangible assets of value as a result of the contracts.

Second, even if the benefit to the government was the invention of these precise batteries, the Fifth Circuit has expressly rejected this "no harm, no foul" argument. For example, in *Aerodex*, the defendants argued that the bearings they actually supplied—rather than the ones for which the Navy contracted—were considered interchangeable by the entire aviation industry. *Aerodex*, 469 F.2d at 1007. The court disagreed and explained that "[t]he mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if it can be shown that they attempted to deceive the government agency." *Id.* Although, the *Aerodex* court eventually found that the two type of bearings were not, in fact, interchangeable, it based its holding in part on the falsity of the statement rather than the end product delivered. *Id.* at 1008, 1011.

Later, in *Peterson v. Weinberger*, the Fifth Circuit again rejected a "no harm, no foul" argument. 508 F.2d 45 (5th Cir. 1975). In *Peterson*, James Peterson submitted Medicare claims for physical therapy performed by Peterson's company, but used his brother's name and provider number. *Id.* at 48. Peterson argued that the patients had received the physical therapy performed by qualified people, so the government was not harmed. *Id.* at 52. The court rejected this argument as unsound, explaining that had Peterson submitted the claims under his own name, they would not have been paid. *Id.* The benefit of the government's bargain was medical services provided by

12

*eligible* doctors. *Id.* Even though fully qualified staff may have performed the physical therapy, the claims for payment were false. Therefore, the court found that the government had been damaged for the full amount.

In the instant case, according to the testimony of the reviewers assigned to the LPT proposals, had LPT submitted truthful proposals, neither reviewer would have recommended the proposals for funding. Dkt. 107 at 33-35. As in *Peterson*, the person who performed the work under the contracts—assuming *arguendo* that all of the work was completed and not duplicative—was not the person eligible to receive funds under the government program. The government's benefit of the bargain was to award money to *eligible* deserving small businesses. That is precisely what LPT denied to the government. Accordingly, the government did not get the benefit of its bargain.

## C.    Value of the SBIR Programs

The government argues that it has been damaged for the entire amount of SBIR funding under the four contracts. According to it, the government's total damage is incalculable. Through LPT's fraudulent inducement of the SBIR research funds, it diverted those same funds from deserving eligible small businesses, undermining Congress's objectives for the SBIR program. The funds for each SBIR program are finite. Additionally, the government reminds the court, that there is simply no way to measure the innovations lost by not funding these other, deserving, small businesses. Lastly, the government argues that LPT's misrepresentations went directly to the heart of the SBIR programs—their ability to perform research on technology that was novel and innovative. The question becomes: what is the value derived by the government from its SBIR programs?

13

LPT could argue that the value the government received from all of this was the availability of battery technology that did not exist prior to LPT's research.  Therefore, it could be argued that the government did receive value—albeit intangible value—from LPT in return for funding.  But, that argument would misstate the whole purpose of funding under the SBIR.  The government's objective, both statutorily and contractually, is not to confer a benefit upon itself.  *See* 15 U.S.C. § 638(a).  Instead, its goal is to give funding opportunities to small businesses to make those businesses more competitive.  *Id.*; *see also* 15 U.S.C. § 631(a).  If, for example, Congress had merely wanted the innovation for the Department of Defense, it had many other more straightforward means of achieving that goal.  The SBIR and STTR[11] programs could have been recodified under Chapter 63 of Title 15, entitled Technology Innovation.  15 U.S.C. §§ 3701 et seq.[12]  Or, they could have

---

[11]  The STTR Program is the Small Business Technology Transfer Program.  It was created in 1992 and funds cooperative research projects between a small business and research institution. 15 U.S.C. § 638(n)-(p); Department of Defense, Small Business Innovation Research Small Business Technology Transfer, Overview, http://www.acq.osd.mil/osbp/sbir/overview/index.htm (last visited Dec. 26, 2007).

[12]  It is the purpose of this chapter to improve the economic, environmental, and social well-being of the United States by–

> (1) establishing organizations in the executive branch to study and stimulate technology;
> (2) promoting technology development through the establishment of cooperative research centers;
> (3) stimulating improved utilization of federally funded technology developments, including inventions, software, and training technologies, by State and local governments and the private sector;
> (4) providing encouragement for the development of technology through the recognition of individuals and companies which have made outstanding contributions in technology; and
> (5) encouraging the exchange of scientific and technical personnel among academia, industry, and Federal laboratories.

15 U.S.C. § 3702.

been added to Chapter 148 of Title 10 authorizing cooperative agreements for research and development projects for the armed forces.  10 U.S.C. §§ 2511-2519.  Congress did neither of these things.  It chose instead to enact the programs under the umbrella of the Small Business Act with the stated purpose of encouraging entrepreneurship and free competition.  15 U.S.C. § 631(a).

The D.C. Circuit has recently had occasion to address a government program whose value was lost entirely though fraud.  In *United States v. TDC Management Corporation, Inc.*, the defendant TDC had contracted with the Urban Mass Transit Authority to find private investors and sureties for minority enterprises wanting to bid on large transportation construction projects.  288 F.3d 421, 422-23 (D.C. Cir. 2002).  TDC's role in the project was as an impartial ombudsman.  *Id.* However, TDC did not maintain its impartiality.  *Id.* at 428.  TDC began charging fees to the minority businesses for its assistance, and participating in joint ventures with private investors.  *Id.* The D.C. Circuit agreed "that the Program no longer had any value to the government."  *Id.* Additionally, the court explained that the valuation of damages was different from regular benefit of the bargain FCA cases, because the Program "did not call for TDC to produce a tangible structure or asset of ascertainable value."  *Id.* (distinguishing *Ab-Tech Construction, Inc v. United States*, 31 Fed. Cl. 429 (1994) and *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966)).

However, the loss of the intangible benefit of a program does not automatically vitiate the value of the program.  In *Ab-Tech Construction v. United States*, Ab-Tech contracted with the government to build an automated data processing facility.  31 Fed. Cl. 429, 431-32 (1994).  The agreement was made under the auspices of Section 8(a) of the Small Business Act which mandates that subcontracts be given to small businesses owned and controlled by "socially and economically disadvantaged individuals."  *Id.* In violation of the SBA's mandate, Ab-Tech entered into an

15

indemnity agreement with a third company which, had it been revealed to the Small Business Administration, would not have been approved. *Id.* at 432-34. The court found that "by deliberately withholding from SBA knowledge of the prohibited contract arrangement with [the third company], Ab-Tech not only dishonored the terms of its agreement with that agency but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program." *Id.* at 434. The government asked the court for damages equaling the amount of the progress payments made under the contract—$1.4 million out of a total $1.5 million—times three. *Id.* The court declined saying that the government had suffered no damages because it "got essentially what it paid for—an automated data processing facility built in accordance with the contract drawings and specifications." *Id.* Notably, however, the government had a tangible asset of value at the end of the contract. The Sixth Circuit has explained that even under a benefit of the bargain theory, if the end-product has no value to the government, then it is entitled to full recovery. *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998). Since the legislative history of the SBIR demonstrates that the value of the program lies not in innovation, but in innovation *by eligible small businesses*, it is clear that any alleged end-product of the Four Contracts is valueless from the government's standpoint.

### C.    Actual Damages

Although they differ dramatically on the nature of the government's intended benefit under the Four Contracts, the parties agree that whether the government received a benefit is the heart of the question. If the benefit is tangible, like a bridge or a widget (or a battery), then the government has no end-product. The SBIR was expressly written to foster commercialization by the small

16

businesses, not produce bridges or widgets.[13]  15 U.S.C. §§ 631(a), 631a 7 638(a).  If the government

has gained some intangible benefit because of the invention of these new batteries, that is clearly

offset by the lost opportunity for innovation by the eligible deserving small businesses that did not

receive the funds which LPT fraudulently induced from the government.  There is simply no way

to speculate whether an eligible small business would have created an innovation of greater or lesser

value.  If the benefit to the government is the encouragement of entrepreneurship and free

competition by eligible small businesses, then the government again has gained no benefit.

Therefore, the proper amount of actual damages for the Four Contracts is the amount paid out on the

Four Contracts—$1,657,455.00—multiplied by three for a total of $4,972,365.00.

LPT argues that "the government is seeking a windfall so great that it would offend due

process under the Fifth Amendment." Dkt. 112 at 7.  This argument misstates the law.  The Supreme

Court in *Cook County, Illinois v. United States ex rel. Chandler* explained that the FCA's treble

damage provision is not the equivalent of classic punitive damages.  538 U.S. 119, 120 (2003).

Because the FCA has no provision for compensatory damages, the treble damages amount is

intended to repay the government for the expense of tracking down and prosecuting the fraud.  *Id.*

Additionally, the FCA requires that a percentage of the award be paid to the relator.  *Id*.  Moreover,

"Congress considered and was satisfied that the 1986 amendments to the False Claims Act did not

violate any constitutional rights." *Morse Diesel Int'l, Inc. v. United States*, ___ Fed. Cl. ___, 2007

WL 3277293 (Fed. Cl. 2007) (citing 132 CONG. REC. S9806 (1986)) (pagination not available).  The

---

[13]   Under the general terms of the Department of Defense's SBIR Program, it retains a royalty-free license to use the innovation, but no intellectual property rights. Dkt. 67, Ex. 8(a) at 12. However, the license has no value to the government because (1) it is not in the business of manufacturing batteries, and (2) it is not the benefit contemplated by the SBIR.

treble damages plus civil penalty framework relates directly to Congress's goal of deterring the rampant fraud in federal contracting. *Id.* (providing an exhaustive examination of the Due Process argument in an FCA context). Therefore, an award of treble damages does not violate the Constitution. As for LPT's "windfall" argument, it is specious at best. Moreover, no matter what damages the court awards, LPT still has all of its intellectual property. Accordingly, the windfall argument also fails.

And last, LPT argues that "[n]o court has ever applied a fraudulent inducement/disgorgement theory in the absence of some tangible injury to the government." Dkt. 112 at 6-7. LPT cites *Harrison* and *Laird* for this proposition. Neither case supports this position. *Laird* found that there had been no false statement and thus never addressed damages. *United States ex rel. Laird v. Lockheed Martin Engineering & Science Servs. Co.*, 491 F.3d 254, 259 (5th Cir. 2007). *Harrison* addressed damages in the situation where there was a tangible *benefit* to the government, not a lack of tangible *injury*. *Harrison*, 352 F.3d at 923. The court in *Harrison* was unwilling to make the defendant contractor disgorge all of the money that the government paid under its contract, because the government had received the benefit of the work performed. *Id.* However, this holding does not support the reverse proposition that absent a tangible injury disgorgement is inappropriate. Additionally, this argument is weakened because the facts here are novel.

### D.    Civil Penalty

The second part of the penalties awarded under the False Claims Act is a civil penalty of not less than $5,500 and not more than $11,000. 31 U.S.C. § 3729. The government argues that the court should assess a penalty for each of the 54 vouchers submitted under the Four Contracts. And, case law suggests that a forfeiture for each invoice may be appropriate. *Bornstein*, 423 U.S. at 311;

*see also United States ex rel. Marcus v. Hess*, 317 U.S. 537, 552, 63 S. Ct. 379 (1976); *Faulk*, 198 F.2d at 171.  LPT argues that it should be subject only to the minimum fine, and then only once for each of the Four Contracts.  Dkt. 112 at 7.  However, in support of this, it merely offers the same arguments discussed in the section above.

The calculation of the forfeitures, both in number and amount is not automatic.  In *Bornstein*, the Court cautioned that courts should focus on "the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures."  *Bornstein*, 423 U.S. at 313. For example in *Bornstein*, the government asked for a forfeiture on each of the 35 invoices submitted for the radio tubes at issue.  *Id.*  But, the district court assessed only one forfeiture, because the radio tubes were shipped under one contract.  *Id.*  However, the Supreme Court found that the subcontractor had committed three separate causative acts—three shipments of falsely marked tubes.  *Id.*  Therefore, the subcontractor was liable for three forfeitures.  *Id.*

In *Hess*, electrical contractors colluded to remove competition from the bidding process for P.W.A. contracts.  *Hess*, 317 U.S. at 543.  The government argued that it was entitled to a forfeiture on "every form submitted by respondents in the course of their enterprise."  *Id.* at 552.  The defendants argued that there should be only one single forfeiture.  *Id.*  The district court decided that instead a forfeiture would be paid for each separate P.W.A. project.  *Id.*  The Supreme Court agreed, saying that "[t]he incidence of the fraud on each additional project is as clearly individualized as is the theft of mail from separate bags in a post office."  *Id. ; see also United States v. Krizek*, 111 F.3d 934, 939 (D.C. Cir. 1997) ("The gravamen of these cases is that the focus is on the conduct of the defendant.  The Court asks, 'With what act did the defendant submit his demand or request and how many such acts were there.'") (citing *Miller v. United States*, 550 F. 2d 17, 24 (1977) (assessing five

forfeitures because contractor sent five monthly billings even though each billing contained eleven separate invoices); *United States v. Woodbury*, 359 F.2d 370, 378 (9th Cir. 1966) (ten forfeitures awarded on ten applications for payment containing numerous invoices each); *United States ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 46 F. Supp. 2d 546, 554 (E.D.La. Apr. 27, 1999) *rev'd on other grounds* 244 F.3d 486 (5th Cir. 2001) ("It is the number of applications for funds, and not the number of coded items on each application, or the number of invoices generated by the applications, or the number of contracts the applications represent, that determines the number of claims made"). *But see United States v. Conway TEC Corp.*, No. H-86-1198, 1996 WL 41842 at *1 (S.D.Tex. Jan. 23, 1996) (Black, J.) (fifty-two forfeitures on fifty-two invoices). Accordingly, the court considers the acts of the defendants in determining the number of forfeitures.

In the instant case, like *Hess*, liability was predicated on fraudulent inducement of contracts. In *Hess*, the Court assessed a forfeiture for each contract. *Id.* Here, the government moved for and the court granted summary judgment on liability premised on the fraudulent inducement of the Four Contracts. In its order, the court stated that:

> The court finds that the defendants made false claims in violation of sections 3729(a)(1) and (2) on the contracts designated as Army Phase I, Air Force Phase I, and Air Force Phase II. Therefore, the invoices based on all four contracts at issue here are "false claims" based on a fraudulent inducement theory.

Dkt. 107. However, the court made no finding regarding the falseness of the individual invoices themselves. Instead, the court found that the false statements were the Four Contracts and that falseness was imputed to the invoices. The court's statement was based in part on the Supreme Court's finding in *Hess* that "[t]his fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid

20

by the P.W.A." *Hess*, 317 U.S. 542-43.  In *Hess*, although the Court imputed the taint to every demand for money, it only awarded forfeitures on each P.W.A contract.  *Id.* at 552.  *Hess* then would suggest that although the invoices are tainted by the initial fraud, it is the contracts themselves that trigger the forfeiture.  This methodology comports with the Court's holding in *Bornstein* awarding forfeitures on each of the defendant's causative acts.  *Bornstein*, 423 U.S. at 313.  Here, the court has found that the causative acts are the Four Contracts.  Therefore, in light of *Bornstein* and *Hess*, the court will assess one forfeiture for each of the Four Contracts.  However, because the defendants' fraud was systematic and knowing, the court will assess the maximum amount for each forfeiture. The forfeiture for Army Phase I is $10,000 and the forfeiture for each of the remaining three contracts is $11,000.[14]  Therefore, the total forfeiture is $43,000.00.

## IV.   CONCLUSION

Pending before the court is the plaintiffs' motion for summary judgment on damages, and defendants' cross-motion for summary judgment on damages. Dkts. 110 & 112. Upon consideration of the motion, response, reply, the record, the applicable, and for the foregoing reasons, the court awards damages as follows:

It is ORDERED that for the contract designated by the court as Army Phase I, judgment is entered against the defendants for $175,605.00 (3 x $58,535.00) in actual damages, plus a forfeiture of $10,000.00.

---

[14]   Prior to August 30, 1999, the minimum and maximum penalties were $5,000 and $10,000 respectively.  *See* 28 C.F.R. § 85.3(a)(9) (2007).  The Army Phase I Contract predated the change in civil penalties.  Therefore, the court awards a civil penalty based on the rule in place at the time of the offense.

21

It is further ORDERED that for the contract designated by the court as Army Phase II, judgment is entered against the defendants for $2,247,444.00 (3 x $749,148.00) in actual damages, plus a forfeiture of $11,000.00.

It is further ORDERED that for the contract designated by the court as Air Force Phase I, judgment is entered against the defendants for $299,973.00 (3 x $99,991.00) in actual damages, plus a forfeiture of $11,000.00.

It is further ORDERED that for the contract designated by the court as Air Force Phase II, judgment is entered against the defendants for $2,249,343.00 (3 x $749,781.00) in actual damages, plus a forfeiture of $11,000.00.

The total damages are $4,972,365.00 in actual damages for money paid out by reason of the false claim, plus $43,000.00 in civil forfeitures for a total of $5, 015,365.00 plus post judgment interest of 3.28%.

Finally, for all of the reasons enumerated above, LPT's cross-motion for summary judgment is DENIED.  Dkt. 112.

It is so ORDERED.

Signed at Houston, Texas on January 3, 2008.

_____
Gray H. Miller
United States District Judge